IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. ELIZABETH D. HOLT, | ) ) ) | |
| | ) | Case No. 18-CV-00860 |
| Plaintiffs, | ) ) | |
| vs. | ) ) | SECOND AMENDED COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS |
| MEDICARE MEDICAID ADVISORS, INC., MEDICARE MEDICAID ADVISORS USA, INC., CAREFREE INSURANCE INC., AETNA INC., HUMANA INC., BLUE CROSS BLUE SHIELD OF KANSAS CITY and UNITEDHEALTHCARE INSURANCE COMPANY | ) ) ) ) ) ) ) ) ) ) | ACT [31 U.S.C. §3729 *et seq.*]  **JURY TRIAL DEMANDED** |
| Defendants. | | |

_____

Elizabeth D. Holt ("Holt" or "Relator") through her attorneys, Wexler Wallace LLP and The Pepper Law Firm, LLC, file this Complaint on behalf of the United States of America and in her own name against defendants Medicare Medicaid Advisors, Inc., Medicare Medicaid Advisors USA, Inc. (f/k/a Carefree Solutions USA, Inc.) (Medicare Medicaid Advisors, Inc. and Medicare Medicaid Advisors USA, Inc. are collectively referred to herein as "MMA"), Carefree Insurance Inc., Aetna Inc., Humana Inc., Blue Cross Blue Shield of Kansas City, and United Healthcare Insurance Company, pursuant to the provisions of the False Claims Act (defined below).

## INTRODUCTION AND SUMMARY OF ACTION

1.      This is an action to recover damages and civil penalties on behalf of the United States of America pursuant to the Federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* arising out of MMA's systematic, company-directed fraud relating to Medicare Advantage plans based on the falsification of government-mandated agent certifications, leading to widespread violations of CMS regulations regarding the marketing of Medicare Advantage plans.  As a result of MMA's wrongful conduct, tens of millions of dollars of commission payments have been made by the U.S. government from its Medicare funds. This is also a False Claims Act case on behalf of the United States of America against the defendants Aetna Inc., Humana Inc., Blue Cross Blue Shield of Kansas City, and United Healthcare Insurance Company for their failures to comply with obligations to ensure the proper marketing and sale of their respective Medicare Advantage plans.

2.      Relator Holt formerly worked for MMA. Prior to, including her work for MMA, and since termination, Relator has had many years of experience relating to the sales of Medicare Advantage plans to Medicare beneficiaries.  Holt is in possession of information that MMA has

2

engaged, and continues to engage, in widespread fraudulent activity related to the Medicare Advantage program.

3.      Examples of MMA's fraudulent activity include: widespread, company-directed falsification of Medicare Advantage certification testing; widespread, company-directed falsification of Medicare Fraud Waste and Abuse certification testing; and widespread, company-directed disregard for CMS regulations governing how Medicare Advantage plans are sold to the vulnerable Medicare beneficiary population.

4.      These fraudulent schemes caused the Medicare program to pay tens of millions of dollars in fraudulent commissions that, had CMS known of the fraudulent activity, would never have been authorized.

5.      MMA's business model and business practices are wholly predicated on the wanton disregard of carefully constructed CMS regulations that are designed to protect both Medicare beneficiaries and the financial integrity of the program for the sole purpose of obtaining lucrative commissions to which MMA is not entitled.

6.      Defendant Carefree Solutions USA is Medicare Medicaid Advisors, Inc.'s "sister company." On information and belief, Carefree Solutions USA changed its name to Medicare Medicaid Advisors USA, Inc. ("MMA USA") in 2019.

7.      Defendants Aetna Inc. ("Aetna"), UnitedHealthcare Insurance Company ("UnitedHealthcare"), Humana Inc. ("Humana"), and Blue Cross Blue Shield of Kansas City ("Blue KC") are insurance companies that sell Medicare Advantage plans to Medicare beneficiaries ("MA organizations").  All of these MA organizations sold their Medicare Advantage plans through MMA.

3

8.      Aetna Coventry is a wholly owned subsidiary of Aetna, Inc. According to an Aetna, Inc. press release, on May 7, 2013, "Aetna completed its acquisition of Coventry Health Care, Inc." and "increases [Aetna's] mix of business in higher-growth Government programs" that include Medicare Advantage.  Accordingly, any sale of any "Coventry" Medicare Advantage Plan was, in fact, a sale of an Aetna plan.

9.      Each of these MA organizations was put on notice by the Relator on September 11, 2017 about MMA's illegal conduct, yet continued to do business with MMA. For its part, and despite purportedly conducting an investigation into MMA, Aetna directly invested in MMA so as to continue to profit from MMA's illegal conduct.

10.      Each of these MA organizations were put on notice by the Relator about MMA's illegal conduct again on February 20, 2018, yet continued to do business with MMA.

11.      Section 110.3 of the CMS's Medicare Communications and Marketing Guidelines states that MA organizations "must oversee downstream entities to ensure agents/brokers abide by all applicable state and federal laws, regulations and requirements."

12.      Aetna, Humana, UnitedHealthcare, and Blue KC all failed to oversee MMA to ensure that they abided by all applicable state and federal laws, regulations, and requirements which, in turn, led to the submission of false claims to the government and the retention of money by Aetna, Humana, UnitedHealthcare, and Blue KC that should have been paid to the Federal government.

13.      Since September 11, 2017, Aetna, Humana, UnitedHealthcare, and Blue KC have paid MMA kickbacks in the guise of commissions because they knew that MMA were wantonly

4

disregarding "all applicable state and federal laws, regulations and requirements" related to the sale of Medicare Advantage plans.

14.     Aetna's knowledge of its obligations is indisputable as it has stated that "CMS holds us (Aetna) responsible for the actions of all agents representing Aetna or Coventry."

15.     Aetna's "Producer Guide" states in relevant part:

**Our Agent Oversight team has a responsibility to:**
- Protect Medicare members from being misled during the marketing process
- Oversee agents to ensure they are compliant with CMS requirements
- Tell CMS and other regulatory agencies about marketing violations and report corrective actions taken to fix issues
- Identify and correct inappropriate behavior or activity by agents
- Ensure sales events are conducted in accordance with CMS requirements (e.g., attendees get accurate information and are treated well, agents arrive on time, and cancellations and revisions follow CMS instructions)
- Ensure agencies oversee their agents and downline arrangements

16.     In addition to failing to comply with their oversight obligations, the MA organizations are engaging in a fraud on CMS's Star Ratings system to ensure that they obtain ratings that will enable them to receive federal funds in the form of Quality Bonus Payments and increased rebates from the federal government to which they would otherwise not be entitled.

## PARTIES

17.     Relator Elizabeth D. Holt ("Holt") is a resident of the State of Missouri. Holt was an agent for MMA from September 2015 through December 2016.  Holt is a former agent licensed by the state insurance departments of Missouri and Kansas.  From August to December, 2016, Holt was an agent manager for MMA.

18.     Relator brings this action on behalf of the United States for violations of the Federal False Claims Act.

5

19.     The United States is a plaintiff to this action.  The United States brings this action on behalf of the Department of Health and Human Services ("DHHS"), the Center for Medicare and Medicaid Services ("CMS"), and Medicare.

20.     Defendant Medicare Medicaid Advisors, Inc is a Kansas corporation authorized to do business in the United States, with its corporate headquarters at 8215 Melrose Avenue, Lenexa, Kansas. Medicare Medicaid Advisors, Inc. is an insurance brokerage that operates a network of agents who market and sell Medicare Advantage plans to residents of Missouri, Kansas, Nebraska, Iowa, Illinois, Arkansas, and Oklahoma.

21.     Medicare Medicaid Advisors, Inc. changed its name from Midwest Marketing Associates to Medicare Medicaid Advisors, Inc. (still using the acronym MMA) on or about August, 2018.

22.     Medicare Medicaid Advisors, Inc. has a sister company formerly known as Carefree Solutions USA, Inc. ("Carefree USA"). Medicare Medicaid Advisors, Inc. and Carefree USA share the same direct management. There is a single website for both entities. Carefree USA changed its name to Medicare Medicaid Advisors USA, Inc. as of January 23, 2019. Medicare Medicaid Advisors USA, Inc. serves beneficiaries in Texas, Louisiana, Mississippi, Tennessee, Alabama, Georgia, and Florida. As used here in "MMA" will refer to both Medicare Medicaid Advisors, Inc. and Carefree USA, now Medicare Medicaid Advantage USA, Inc., collectively.

23.     MMA was co-owned by Gary Berke and Melissa Anderson from 2006 until December 2016. At that point, Berke sold his interest in MMA to Kirk and Melissa Anderson.

24.     Defendants Aetna Inc. ("Aetna"), UnitedHealthcare Insurance Company ("UnitedHealthcare"), Humana Inc. ("Humana"), and Blue Cross Blue Shield of Kansas City ("Blue KC") are insurance companies that, among other things and relevant to this case, offer Medicare Advantage plans to Medicare beneficiaries.

25.     Aetna, UnitedHealthcare, Humana, and Blue KC are "plan sponsors." CMS defines a "plan sponsor" as "an entity that sponsors a health plan." Each of these plan sponsors offers their own Medicare Advantage plans to Medicare beneficiaries in Missouri and Kansas, among many other states.

26.     Carefree Insurance Services, Inc. ("Carefree Insurance") is a self-described as "a full-service Field Marketing Organization" that "represents insurance companies who offer products to the Medicare and commercial markets in the United States including Medicare Advantage…" Carefree Insurance is a wholly owned subsidiary of Aetna.

27.     Carefree Insurance receives money from insurance carriers to assist brokerages like MMA to sell Medicare Advantage plans.

28.     Despite knowing that MMA engaged in the illegal business practices outlined herein, Carefree Insurance contracted with MMA to assist it with funding to open new offices and provide cash transfers in exchange for Medicare Advantage plan contracts.

29.     On September 15, 2017, James Fagan, President of Carefree Insurance attended a sales meeting at MMA's headquarters then in Overland Park, Kansas. At this meeting, Mr. Fagan told the attendees, including both MMA sales agents and MMA senior management, that Carefree Insurance was entering into a joint business arrangement with MMA wherein Carefree would operate new sales offices with MMA to sell Medicare Advantage plans. Mr. Fagan further

7

stated that these new offices would be under the "Carefree USA" banner and not the MMA banner. Mr. Fagan stated that Carefree Insurance Services was the "Field Marketing Organization" for Aetna and Coventry branded Medicare Advantage plans.

30.     Carefree USA and Carefree Insurance shared an office at 8200 NW 41st Street, Suite 175, Doral, Florida.

31.     Consequently, Aetna, through its wholly owned subsidiary Carefree Insurance, funded the opening of other Carefree USA offices in Texas, Louisiana, and Florida

32.     Upon information and belief, Carefree Insurance was a partial owner of Carefree USA.

33.     Upon information and belief, Aetna is directly invested in the operations of MMA and MMA's "sister company" Carefree USA through its wholly owned subsidiary Carefree Insurance.

34.     Aetna's wholly-owned subsidiary Carefree Insurance and Carefree USA are so entwined in MMA's business operations as to make them indistinguishable from one another.

## JURISDICTION AND VENUE

35.     The claims in this Complaint arise under the provisions of 31 U.S.C. §3729, *et seq.*, known as the "False Claims Act."

36.     Based on the False Claims Act, Relator seeks through this action to recover damages and civil penalties arising from commissions paid to MMA as a result of false and fraudulent claims submitted by or caused to have been submitted by MMA in violation of the False Claims Act.

37.     This Court has jurisdiction over this action pursuant to 31 U.S.C. §§3730, 3732(a), 28 U.S.C. §1345, and 28 U.S.C. §1331, because this action arises under the laws of the

8

United States. This court has personal jurisdiction over MMA pursuant to 31 U.S.C. §3732(a) because the Defendants have minimum contacts with the United States and regularly transact business in this District.

38.     Venue is proper in the Western District of Missouri pursuant to 28 U.S.C. §1391(b) and (c) and 31 U.S.C. §3732(a) because the Defendants have transacted business in this District at all relevant times.

39.     Relator has served a copy of the Second Amended Complaint and requisite disclosure statements on the federal government. The disclosure statements were and are supported by material evidence.

40.     On or about August 2, 2021, the United States filed a notice of its intent to decline to intervene in this matter.

## BACKGROUND AND APPLICABLE LAW

41.     The Centers for Medicare and Medicaid Services (CMS), formerly known as the Health Care Finance Administration (HCFA), is the agency of the United States Department of Health and Human Services (HHS) delegated with administering the Medicare Program.

42.     Generally, Medicare is the federal system of health insurance for people over 65 years of age and for certain younger people with disabilities. Medicare reimburses health care providers for covered services for Medicare patients. Medicare determines what types of services are covered and therefore reimbursable, and at what rate the covered service will be reimbursed. Providers enrolled in the Medicare program agree to submit claims for only medically and reasonably necessary services that are covered under the program and to only seek compensation to which the provider is legally entitled.

9

43.     In the late 1990s, Medicare began contracting with private insurance companies, known as Medicare Advantage organizations ("MA organizations"), to offer additional avenues through which citizens could obtain their Medicare coverage.

44.     An MA organization is "a public or private entity organized and licensed by a State as a risk bearing entity (with the exception of provider-sponsored organizations receiving waivers) that is certified by CMS as meeting MA contract requirements." 42 CFR 422.2(3).

45.     MA organizations administer Medicare plans known as Medicare Advantage Plans ("MAP").[1]

46.     Once eligible for Medicare, a citizen may opt for Original Medicare, which is traditional Medicare administered by the government, or he/she may choose a MAP.[2]

47.     Because MAPs are alternatives to Original Medicare (but are still Medicare), the government has enacted a carefully constructed regulatory scheme that governs how MAPs may be marketed. *See, e.g.,* 42 CFR 422, Subpart V. These regulations are intended to ensure that Medicare beneficiaries are handled as the government has determined is appropriate, whether a beneficiary opts for Original Medicare or a MAP.

48.     MMA is headquartered in Lenexa, Kansas and has additional offices in St. Louis and Springfield, Missouri, Oklahoma City, Oklahoma, Memphis, Tennessee, Shreveport and Baton Rouge, Louisiana, Birmingham, Alabama, Sarasota, Florida, Dayton, Ohio, Des Moines, Iowa, and Flowood, Mississippi.

---

[1] https://www.medicare.gov/sign-up-change-plans/medicare-health-plans/medicare-advantage-plans/medicare-advantage-plans.html.
[2] https://www.medicare.gov/people-like-me/new-to-medicare/getting-started-with-medicare.html.

10

49.     In business since 2006, MMA is an insurance brokerage firm that claims to have purportedly helped tens of thousands of Medicare Beneficiaries and is represented by agents which MMA designates as independent contractors.

50.     In simple terms, MMA is a general agency that manages a network of agents to market private insurers' MAPs.

51.     According to its website, MMA represents insurance companies that offer MAPs, including but not limited to: Aetna Coventry Medicare (a subsidiary of Aetna), Anthem BCBS Medicare, Blue KC BCBS Medicare, Humana Medicare, and United HealthCare Medicare.

52.     The government compensates private insurers for administering Medicare coverage for those individuals who opt for a MAP over Original Medicare. The government also compensates the agents who market MAPs—agents who, only under specific circumstances, may walk through plan options with individuals who are eligible for Medicare, help such individuals enroll in a MAP, and service those individuals as clients, once they are enrolled.

53.     Similar to many areas of the insurance industry, agents are paid by commission. Each year, CMS publishes and sets commission rates for these agents, by MA organization and by geographic area.[3]

54.     CMS has long had regulations in place to ensure that agents would only receive commissions if they were properly certified by pursuant to CMS regulations.

55.     On a yearly basis, CMS updates its "Medicare Marketing Guidelines" ("Guidelines"). On August 7, 2009, CMS updated its Guidelines to include the following

---

[3] *See, e.g.,* https://www.cms.gov/Medicare/Health-Plans/ManagedCareMarketing/AgentBroker.html.

direction:

- Plan sponsors should pay compensation in accordance with the structure in place when the enrollment occurred so long as the agent is in good standing and the member is still enrolled. Further, the commission structure of the receiving health plan (rather than the losing health plan) applies to any replacement enrollment. An agent is in good standing if (s)he is appointed to sell in the State (if required), annually trained and tested, and maintains a passing score of 85 percent.

56.     Consequently, agents may only receive commissions if they are in "good standing" as defined by CMS. An agent is in "good standing" if "(s)he is appointed to sell in the State (if required), annually trained and tested, and maintains a passing score of 85 percent (on those tests)."

57.     The "compensation" that the plan sponsors pay consists of federal funds paid by CMS to the plan sponsors as "non-benefit expenses" to assist the sponsors in the administration of the insurance plans.

58.     In private insurance sales, commissions paid to sales agents are funded by premiums paid for by the privately insured beneficiary.

59.     In contrast, Medicare Advantage commissions paid to sales agents are funded by CMS as part of the contract between the insurance company and CMS.

60.     In fact, the April 25, 2007 Medicare Managed Care Manual stated in relevant part "MA organizations must inform all related entities, contractors and subcontractors, first tier and downstream entities that payments they receive are, in whole or in part, from *Federal funds*." (Emphasis supplied.)

61.     MA organizations receive and then pay tremendous amounts of federal funds as commissions to brokers and/or agents who sell MAPs.

12

62.     CMS defines a Medicare Advantage commission as a "non-benefit expense" for MAP contracting purposes. Within the contract between the MAP provider and CMS, commissions (and other "Sales & Marketing" expenses) must "be entered separately" on the "Medicare Bid Pricing Tool."[4] Consequently, a portion of the overall contract CMS pays to the MA Organization is for commissions to be paid to agents for new and re-enrolled MAPs.

**Non-Benefit Expenses**

Non-benefit expenses are all of the bid-specific administrative and other non-medical costs incurred in the operation of the MA plan.

Worksheet 4 distributes the non-benefit expenses proportionately between Medicare-covered benefits and A/B mandatory supplemental benefits (excluding the PMPM impact of the ESRD subsidy). Non-benefit expenses are further distributed within A/B mandatory supplemental benefits between "Additional Services" and "Reduction of A/B Cost Sharing."

The non-benefit expenses must be entered separately on the BPT for the following categories:

- Sales & Marketing
  - This category includes all direct and indirect sales and marketing expenses for the MA plan.
  - Examples include, but are not limited to the costs of—
    - Marketing materials;
    - Commissions;
    - Enrollment packages;
    - Identification cards; and

**PRICING CONSIDERATIONS**

- Salaries of sales and marketing staff.

---

[4] CMS -10142 (CY 2018) at 34, CMS -10142 (CY 2016) at 33.

13

64.     The Medicare Advantage Bid Pricing Tools for the years 2009, 2010, 2011, 2012, 2013, 2014, 2015, and 2017 also list "commissions" as a "non-benefit expense" that must be included in Medicare Advantage bids.

65.     Consequently, "commissions" paid to plan sponsors were—and are—separate line items with specific amounts in the "bid" insurance companies submit to CMS to obtain Medicare Advantage contracts.

66.     Furthermore, "non-benefit expenses" like commissions "are all of the bid-specific administrative and other non-medical costs *incurred in the operation of the MA bid*." (Emphasis supplied.)

67.     These commissions, funded exclusively by federal dollars, are then paid out to agents and broker agencies like MMA.

68.     Importantly, and as will be seen *infra*, none of MMA's agents were "in good standing" because MMA committed widespread sales agent certification fraud. Consequently, MMA was not eligible for compensation (i.e., commissions).

69.     As described *infra*, MMA directed its agents to wantonly disregard well-established CMS regulations that were designed to protect Medicare beneficiaries.

70.     CMS regulations mandate that MA organizations—including Defendants Aetna, Humana, UnitedHealthcare, and Blue KC—"ensure" that agents that sell their MAPs are compliant with the certification requirements (which, among other things, are designed to ensure that agents are marketing MAPs without violating the rules that were implemented to assure that a potentially vulnerable population is not misled).

71.     The regulations read:

14

(c) Annual training. The MA organization must ensure that all agents and brokers selling Medicare products are trained annually on the following:

(1) Medicare rules and regulations.

(2) Details specific to the plan products they intend to sell.

(d) Annual testing. It must ensure that all agents and brokers selling Medicare products are tested annually, to ensure the following:

(1) Appropriate knowledge and understanding of Medicare rules and regulations.

(2) Details specific to the plan products they intend to sell.

42 CFR §§422.2274(c)-(d).

## CMS requirements to sell Medicare products

72.     On July 15, 2008, Congress passed the Medicare Improvements for Patients and Providers Act of 2008 ("MIPPA"). MIPPA specifically directed the Secretary to "establish limitations" that included the following:

> (E) **REQUIRED** TRAINING, ANNUAL **RETRAINING**, AND **TESTING** OF AGENTS, BROKERS, AND OTHER THIRD PARTIES.
> The use of a Medicare Advantage organization of any individual as an agent, broker, or other third party representing the organization that **has not completed an initial training and testing program and does not complete the annual retraining and testing program**. (Emphasis supplied.)

73.     Thus, by statute, if an agent, broker or other third party representing an MA organization "has not completed an initial training and testing program and does not complete the annual retraining and testing program," that agent, broker or other third party is prohibited from selling MAP policies.

74.     In implementing MIPPA, CMS established regulations concerning the training of agents and brokers who sell Medicare products. CMS broker training guidelines state in relevant part:

15

CMS provides annually Agent and Broker requirements for training and testing. Plans/Part D sponsors should use at a minimum the high-level Agent/Broker training and testing criteria below to develop individual training and testing for Agents and Brokers. Plans/Part D sponsors may organize their training at their discretion, provided the training meets the minimum requirements below.[5]

75.     CMS regulations require that "all agents and brokers selling Medicare products are trained annually on the following: (1) Medicare rules and regulations"; and "(2) Details specific to the plan product they intend to sell." 42 CFR 422.2274(c).

76.     CMS requires that agents complete training through a CMS-approved vendor, and most large carriers (including those served by MMA) use America's Health Insurance Plans ("AHIP") as their approved vendor.[6]

77.     Agents have to score 85% or better on the annual exam in order to be certified to sell Medicare products.[7]

78.     Training and testing procedures must be put in place to ensure that each agent who will be marketing MAPs is "taking [certification] test[s] independently, maintaining the integrity of the training and testing program."[8]

79.     Information on training and testing must be available to CMS upon request, including documentation concerning evidence of completion.[9]

---

[5] https://www.cms.gov/Medicare/Health-Plans/ManagedCareMarketing/Downloads/2015Agent BrokerTrainingGuidelines.pdf.
[6] *See* https://www.cms.gov/CCIIO/Programs-and-Initiatives/Health-Insurance-Marketplaces /Downloads/AB-PY19RegTrainingNewABs-TipSheet-July112018.pdf
[7] https://agentsurvivalguide.com/faqs-about-ahip.
[8] https://www.cms.gov/Medicare/Health-Plans/ManagedCareMarketing/Downloads/2015Agent BrokerTrainingGuidelines.pdf
[9] *See also* 42 CFR 422.2274(b)(c).

16

80. CMS uses several mechanisms to ensure that MA organizations conduct marketing activities that are compliant with the regulations and marketing guidelines.

81. For example, MA organizations are responsible for the actions of sales agents and brokers whether they are employed or contracted. They must ensure that agents/brokers are properly trained in both Medicare requirements and the details of the products being offered.

82. Part D sponsors also must provide strong oversight and training for marketing activities.

## The Federal False Claims Act

83. The Federal False Claims Act provides, among other things, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. §§3729(a)(1)(A)-(B).

84. The term "knowingly" means "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. §§3729(b)(1)(A)(i)-(iii). Proof of specific intent to defraud is not required. 31 U.S.C. §3729(b)(1)(B).

85. The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used

17

on the Government's behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded …." 31 U.S.C. §§3729(b)(2)(A)(i)-(ii).

86. "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. §3729(b)(4).

87. MMA submits MAPs to MA organizations that are, in turn, submitted to CMS for verification of the beneficiaries' eligibility to participate in the MA program. Only after CMS verifies beneficiaries' eligibility can the MA organizations pay federally-funded commissions to agents and broker agencies.

88. MMA's violations of CMS regulations were material to the government's decision to authorize payment for commissions funded by federal dollars.

89. Put simply, if CMS knew that MMA was wantonly disregarding the regulations regarding the certification of agents and/or wantonly disregarding the regulations regarding the sale of MAPs to Medicare beneficiaries, then CMS would never have authorized the payment of commissions funded by federal dollars to MMA.

**Allegations Against MMA**

90. Since its inception, MMA has completely disregarded the safeguards that the government has implemented through specific regulations designed to protect Medicare beneficiaries.

18

91.     For years, MMA has engaged in a widespread Medicare Advantage sales agent certification fraud scheme—falsely attesting that its agents were fully AHIP- and carrier-certified when MMA knew its agents were not—the sole purpose of which was to illegally obtain sales commissions from the Medicare Advantage program.

92.     MMA's scheme has been hidden from CMS, hidden from the agents, and, for years, hidden from the carriers (and the carriers have been negligent in their duties to ensure that their contracted agents are CMS-compliant).

93.     MMA has also directed its agents to disregard CMS regulations governing the sale of MAPs to Medicare beneficiaries in a brazen scheme to illegally sell MAPs to a vulnerable population.

94.     MMA has developed a network of hundreds of agents since 2006, keeping them in the dark about what was really required of them, while at the same time holding "training" sessions during which MMA teaches its agents marketing techniques that plainly violate Medicare Advantage regulations.

**MMA causes false claims to be submitted to the government
for Medicare Advantage commissions**

95.     MMA has caused thousands of claims to be presented to the government under false pretenses because MMA has prevented virtually all of its agents from being properly certified either through AHIP or for the specific carriers MMA agents represent.

96.     MMA employs agents whose sole source of income is predicated on their success in selling MAPs to Medicare beneficiaries.

97.     MMA agents do not, however, receive renewal commissions. MMA is the sole recipient of renewal commissions and pays them to agents infrequently and at its sole discretion.

98.     For 2018, MMA paid agents up to $165 per sold new-to-Medicare MAP.

99.     By way of illustration, in St. Louis County, CMS set the compensation rate for new apps for 2018 at $455 and for renewal commissions at $228 for up to six years.

100.     Consequently, for every new-to-Medicare MAP an MMA agent sold in St. Louis County, MMA received $455 from CMS and netted at least $290 depending upon how much MMA has agreed to pay the relevant agent. Further, if the beneficiary renewed the plan for each of the following five years, MMA would receive $1,430 from CMS in renewal commissions.

101.     For each MAP MMA submitted for payment of commissions, Medicare was defrauded out of both the value of the "new" app commission as well as the value of the renewal commissions.

102.     Assuming current rates, if MMA has, as it has advertised, sold 70,000 MAPs it has potentially generated in excess of $100 million in commissions (and revenue) since its inception.

103.     Each and every commission (either for a new enrollee or for a renewal of an MAP) paid to MMA based on any of its agents who were not properly certified was improper and would never have been paid absent MMA's fraud.

104.     Agents who market to and enroll individuals in MAPs are required—annually—to be certified both with respect to matters that apply to all Medicare plans and with respect to each specific carriers' MAPs an agent wishes (and is carrier-approved) to market.

105.     With respect to the former certification (referred to as "Medicare Advantage certification" herein for ease of reference), the annual exam includes a number of required topics

including the basics of Medicare—coverage, eligibility, premiums, etc.—and, important here, acceptable ways of marketing MAPs.[10]

106.    Agents who wish to sell MAPs must be Medicare Advantage certified by a CMS-approved vendor. One such CMS-approved vendor is AHIP. AHIP is commonly used and it is "used" by MMA.

107.    The second type of certification ensures that an agent understands the specifics of the MAPs each carrier offers, which the agents intend to market.

108.    CMS provides guidelines regarding the required annual certifications specifically states that the "integrity" of the training and testing is maintained and requires that "each individual" [that will sell Medicare products] takes the certification exams "independently."[11]

109.    MMA completely disregards the entire certification scheme by (a) requiring agents to "take" the certification exams, *en masse*, at a local community college, where MMA representatives are present to answer questions for those who are not getting the questions correct; (b) at the group site, actually take or finish the exams for people who, in MMA's estimation are not likely to pass with the required passage rate; or (c) in some cases, take exams for agents who are not even present and/or do not even know certifications are required or "obtained" on their behalf.

110.    For example, on or about July 25, 2016, Holt and others attended a test taking session MMA held in a rented room—the Regnier Testing Center, Room #243—on the Johnson

---

[10] https://www.cms.gov/Medicare/Health-Plans/ManagedCareMarketing/Downloads/2017-Agent-BrokerTraining-and-Testing-Guidelines.pdf

[11] *See, e.g.,* https://www.cms.gov/Medicare/Health-Plans/ManagedCareMarketing/Downloads/2017-Agent-BrokerTraining-and-Testing-Guidelines.pdf.

County Community College campus, in Overland Park, Kansas to get Medicare Advantage certified and carrier certified. Holt estimates that between twenty-five and thirty agents were present during this MMA session and additional sessions for similar-sized groups were held in the days following. Holt, along with the more than twenty other agents, sat at computer terminals in the rented room to take AHIP and carrier tests. MMA instructed them to raise their hands once they were done with an exam—*but before they submitted it.* When an agent raised his or her hand, an MMA representative—Dawson Mauk, Roger Lund, Kirk Anderson, or Sabrina Mundy (MMA's "Director of Compliance")—would then replace the agent in his or her seat and review the exam and correct any incorrect answers to ensure a passing score. MMA only submitted the agents' exams after MMA had reviewed and corrected them.

111.    MMA's wanton disregard of sales certification requirements continues. For example, MMA held another mass certification session for AHIP, Humana, Cigna Healthspring, and BlueKC on August 4, 2017, at The Regnier Testing Center, Room #243 on the Johnson County Community College campus.



113.     By engaging in this widespread sales agent certification fraud, MMA was able to send out "unqualified agents" to sell MA plans to Medicare beneficiaries and, in turn, obtain commissions that, absent this fraud, it would not have been entitled to.

114.     When they joined MMA, Relator was aware that certifications were required (she had independently and compliantly passed them before any connection to MMA in 2015) and took them with a large group, as required by MMA in July, 2016. At that time, Relator was unaware that MMA's interventions were contrary to CMS regulations.

115.     Relator has become aware since that time that MMA has taken certification exams for agents *while those agents were out in the field* marketing MAPs.

116.     In order to ensure that all of its agents appear to be certified, MMA required all agents to utilize a single password ("Agent007"), which permitted MMA to manipulate answers and scores for individual agents at will. MMA prohibited agents from changing this password.

117.     Relator believes that no MMA agent has ever been Medicare Advantage-certified or carrier-certified under proper CMS-mandated conditions.

118.     Consequently, since the inception of MMA, all of the MAPs submitted by MMA agents were false claims for payment of commissions.

119.     The training and testing procedures utilized by MMA have no integrity and are designed and used to ensure as many MMA agents are out in the marketplace as quickly as possible, selling as many Medicare products as possible—in total disregard for the limitations and obligations placed on those who market Medicare products.

120.     As a result, applications for enrollment in MAPs are submitted to the government—applications which amount to false claims because the agents who sold the policies

23

were not properly certified—and these applications are false claims to the government for the payment of commissions.

121.    More specifically, each time an MMA agent sells a MAP to a beneficiary, he/she is entitled to a commission, the amount of which is expressly determined by CMS.  CMS describes the process as follows:

> Generally, agents/brokers receive an initial payment in the first year of the policy (or when there is an "unlike plan type" enrollment change) and half as much for years two (2) and beyond if the member remains enrolled in the plan or make a "like plan type" enrollment change.

> Agents/brokers **must** be licensed in the State in which they do business, **annually complete training and pass a test on their knowledge of Medicare and health and prescription drug plans, and follow all Medicare marketing rules. Agents/brokers are subject to rigorous oversight by their contracted health or drug plans and face the risk of loss of licensure with their State and termination with their contracted health or drug plans if they don't comply with strict rules related to selling to and enrolling Medicare beneficiaries in Medicare plans**.[12] (Emphasis supplied.)

### 120.5.4 - *Specific Guidance for Developing and Implementing Compensation Strategy*

*(Rev. 93, Issued: 06-04-10, Effective/Implementation: 06-04-10)*

- *Plan sponsors must not pay agents who are no longer appointed to sell in the State (if required), agents who have not been annually trained and tested per the plan's policies and procedures with a passing score of eighty-five (85) percent, or agents who have been terminated for cause by the plan.*

---

[12] https://www.cms.gov/Medicare/Health-Plans/ManagedCareMarketing/AgentBroker.html.

123.    By CMS's two separate and careful uses of the word "must" there is no discretion or safe harbor that would allow an agency broker like MMA to engage in widespread fraudulent certification of its agents and still allow MMA to be paid—let alone retain—its illegally obtained commissions.

124.    CMS regulations determine the value of the commissions agents and brokers can receive for selling a certain Medicare Advantage plan. For example, CMS has determined that an agent who sells a new UnitedHealth AARP Medicare Complete Choice plan in Cass, Clay, Jackson and Platte counties can receive up to a $455 commission. If the same plan is a "renewal," the agent can receive up to a $228 commission.[13]

125.    Regardless, payment of any commission to a sales agent or broker for a MAP is predicated on the sales agent or broker being certified—by CMS—to sell such a plan.

126.    In order for the sales agent to receive the CMS authorized commission, a number of conditions must be met:

   a.    The agent must be properly certified to be a Medicare Advantage insurance agent;
   b.    The agent must "certify" in the beneficiary's application that she has "accurately recorded the information supplied by the applicant;" and she has "given an outline of coverage for the policy applied for and a Guide to Health Insurance for People With Medicare to the Applicant."
   c.    The enrollment form must be sent to the MA organization who, in turn, submits it to CMS for validation of the enrollee's eligibility.
   d.    Lastly, CMS must validate the enrollment to determine whether the member is new to Medicare or not new to Medicare so as to determine what rate of commission the agent will receive for the sale.

127.    For example, Aetna's 2015 Medicare Advantage Producer Manual states in relevant part:

---
[13] See CY2018 CMS Agent Broker Compensation Data.

## New business

For new business members – those who are newly eligible for Medicare – we pay commissions in advance for the first policy year after CMS validates that the member is new to Medicare.

We initially pay 50% of the new business commission amount based on the expected months of enrollment for new business HMO/PPO and PDP plans. After CMS confirms the enrolling member is new to Medicare, we pay the full new business amount. (On commission statements, you'll see a deduction for the initial 50% commission payment and then a payment for the full new business amount.)

128. Consequently, CMS "validates" whether the sales agent is eligible for commission for the policy he or she sold.

129. MMA's fraudulent activities preclude the possibility that its sales agents are properly certified to sell Medicare Advantage plans and that they could "give an outline of coverage for the policy applied for."

130. For its part, on a weekly basis MMA collects enrollment forms its agents obtain from clients, submits the enrollment forms to the MA organizations, and ultimately to CMS.

131. CMS's validation of the enrollment serves two purposes. First, it allows CMS to determine whether the beneficiary is, in fact, eligible to participate in Medicare Advantage. Second, CMS's validation authorizes the payment of a commission for the agent and establishes the rate for that commission. *See* 42 CFR 423.2274.

132. As an example, Aetna Coventry, whose MAPs MMA markets and sells, explicitly delineates that commission payments to agents is predicated on CMS "validating" the

26

enrollment. In other words, an agent is not paid the commission associated with the enrollment in or renewal of a MAP, until CMS validates the enrollment or renewal. Similarly, Aetna's 2015 "Medicare Producer Handbook" reads in relevant part:

**New business**

For new business members – those who are newly eligible for Medicare – we pay commissions in advance for the first policy year after CMS validates that the member is new to Medicare.

**MMA Trains Agents to Violate CMS Regulations**

133.     MMA's sales of MAPs are predicated on unlawfully directing its sales agents to disregard CMS regulations about selling MAPs to Medicare beneficiaries.

134.     Each and every commission (either for a new enrollee or for a renewal of a MAP) paid to MMA based on sales of MAPs that occurred as a result of its agents' violations of CMS regulations would not have been paid if CMS knew about MMA's violations of CMS regulations.

135.     MMA's business practice is to get agents out on the street selling MAPs as quickly as possible.

136.     The annual certification exam that every agent who sells or attempts to sell MAPs is required to take covers, among other things, marketing requirements and regulations relating to MAPs.

137.     Because MMA has prevented and continues to prevent its agents from understanding what is necessary to properly market and sell MAPs by circumventing the

27

certification requirements as described above, MMA has promoted sales techniques that are forbidden by CMS regulations.

138.    Employees of an organization or independent agents or brokers acting on behalf of an organization may not solicit Medicare beneficiaries door-to-door for health-related or non-health-related services or benefits.

139.    Prohibitions against door-to-door selling of MAPs to Medicare beneficiaries are long standing. In fact, during testimony before the Senate's Special Committee on Aging on May 16, 2007, Abby L. Block, Director of CMS's Center for Beneficiary Choices testified:

**Testimony of**
**Abby L. Block, Director**
**Center for Beneficiary Choices**
**Centers for Medicare & Medicaid Services**
**Before the**
**Senate Special Committee on Aging**
**On**
**Medicare Advantage Sales and Marketing Oversight**
**May 16, 2007**

CMS uses several mechanisms to ensure that MA organizations conduct marketing activities that are compliant with the regulations and marketing guidelines. Organizations are responsible for the actions of sales agents and brokers whether they are employed or contracted. They must ensure that agents/brokers are properly trained in both Medicare requirements and the details of the products being offered. Part D sponsors also must provide strong oversight and training for marketing activities. Employees of an organization or independent agents or brokers acting on behalf of an organization may not solicit Medicare beneficiaries door-to-door for health-related or non-health-related services or benefits. Employees, brokers and independent agents must first ask for a beneficiary's permission before providing assistance in the beneficiary's residence, prior to conducting any sales presentations or accepting an enrollment form in person.

28

140.    Consequently, MAP agents are not permitted to market MAPs to anyone who has not indicated an interest in learning about such plans—i.e., no cold-calling or door-knocking is permitted.

141.    Yet, MMA openly tells its agents that "door-knocking is the lifeblood of our company" and provides explicit language to use to "get in the door" to sell MAPs to individuals who have never asked for information regarding such plans, in direct violation of the regulations. *See* 42 CFR 422.2268(b)(13).

142.    MMA instructs its agents to use the "4 corners" approach.  Under this approach, agents were taught to door-knock the person on named on a lead card, signed or not. MMA further instructed agents to then go to the neighbors to the left and right of that home, then across the street to the three neighboring homes (the home directly across the street, and the two diagonally across, from the original home). The four-corners door-knocking strategy encouraged the agent to visit six homes with just one "lead," and further encouraged agents to "claim" that the neighbors had referred the agents to them, whether true or not.   This "4 corners" approach is prohibited by Medicare regulations. 42 CFR 422.2268(b)(13).

143.    MMA advises its agents to cold-call people who may be Medicare eligible and tell them that they may be entitled to benefits they are not currently receiving. To get around the requirement that the Medicare eligible individual must initiate contact or affirmatively indicate and interest before any contact from the agent, MMA then advises agents to tell people they have cold-called and enticed by suggesting they may be entitled to benefits they are not yet receiving, that the agent does not have time to talk at that time, but that if the individual wants to set up an appointment, the agent would be happy to do so.

29

144. MMA provides scripts and during training repeatedly teaches bait-and-switch techniques, telling agents to claim that they are at potential beneficiaries' residences as a result of changes to Social Security and federal benefits to which they might be entitled in order to get in the door, after which the agents attempt to get Medicare Advantage enrollments.

145. As an example, MMA provides agents with copies of "ABCD: Shedding Light on the Confusion Over Medicare Benefits," attached as Exhibit A, or similar materials, to show residents when agents knocked on doors to provide purported justification for their visits.

146. Another MMA script tells agents to say: "I'm a resource and I work with Medicare and I want to make sure that you have all the new benefits they offer so. . .do you have a few minutes. I was referred to you and I wrote down your name and address and I didn't bring their information because I wanted to make sure and talk to you. Do you have a few minutes right now?"

147. The 2014 AHIP training states in relevant part:



## Marketing and Unsolicited Contacts

☐ Marketing representatives are prohibited from making unsolicited contact with beneficiaries, including through:
  ▪ Door-to-door solicitation, including leaving leaflets, flyers or door hangers at a residence or on someone's car;

148. MMA hands out to agents what are known as "lead cards." Examples of redacted lead cards are attached hereto as Exhibit B.

149. Lead cards are provided to individuals who are Medicare-eligible. It is a post-card type form that a person can sign and return if he or she is interested in getting more information.

30

MMA agents may then legally contact that person *only if* that person signed and returned a lead card. But MMA gives its agents unsigned lead cards, and instructs agents on how to use these unsigned lead cards to "get in the door," even telling agents to cover the unsigned portion with a post-it note, or fold over the card so the unsigned portion is not visible.

150.    An MMA sales manual provided specific instructions about how to use these unsigned lead cards.



ACTION POINTS & SCRIPT

## At the Door

1) <u>You have an Appointment - Show Lead Card</u>
    a) <u>Identify Yourself</u>
        (1) My name is Jane Smith and the reason I am here is I work with people who are on Medicare and even Medicaid. I am a resource. I work with programs that can help you save money, especially if you are on a fixed income. Do you have a minute?
        (2) Hi Joyce. My name is Jane Smith. You sent this in the mail (show lead card). It's about Medicare. I work with people that have Medicare. I am a resource. I help make sure that you have all the new benefits that Medicare offers. Do you have a moment?

151.    Even though the manual states that the agent has "an Appointment," this was not true. The agent simply had an unsigned "lead card" and no signed "Scope of Appointment" (described below) that must, according to CMS regulations, be signed 48 hours *before* any meeting between a Medicare Advantage sales agent and a beneficiary.

152.    Consequently, there would be no reason to provide a script asking the beneficiary if she has "a minute" if the beneficiary signed the Scope of Appointment and knew she would be receiving a visit from a Medicare Advantage sales agent.

31

153.    In fact, MMA directs its agents to be sure that the "Scope of Appointment" form is signed. This direction reads in relevant part:



ACTION POINTS & SCRIPT

## Filling out the Paperwork

## 5) Confirm that the Scope of Appointment has been signed

154.    Most brazenly, MMA directs its agents to "show (the) lead card" when, in fact, the "lead card" was unsigned and the beneficiary requested no such visit from the agent.

155.    MMA tells its agents to get the lead cards signed while they are in the home for "storage."

156.    MMA also directs its sales agents to use "Lead Sheets."

157.    In MMA parlance, "Lead Sheets" were lists of names of people over the age of 65 who lived in the area where MMA agents were working on any given day. The people listed on "Lead Sheets" had not requested a visit by an agent.

158.    Consequently, the distribution of "Lead Sheets" to MMA agents facilitated agents engaging in aggressive—and illegal—door to door solicitation of unsuspecting beneficiaries.

159.    In an MMA training manual dated August 21, 2015, MMA instructed its agents to "ask for Lead Sheets for the area you are working."  The document reads in relevant part:

32



## Protect & Submit Paperwork

### Also you should ask for Lead Sheets for the area you are working

160.    MMA also provided "Tips and Hints" to its agents to assist them when the beneficiary was not interested in a MAP.

161.    CMS has identified "Agent/broker misrepresentation" as a "high risk area" for non-compliance with the law, Federal health care program requirements, or an organization's ethical and business policies.

162.    MMA's "Tips and Hints" were, by design, meant to confuse the beneficiary.

163.    First, the agents were told to back to the home "at a later time" even after the beneficiary was trying to cut the unsolicited visit short ("…go by there at a later time and see if you can catch them at home.").

164.    Second, agents were told to "(n)ever give them (the beneficiaries) a yes or no question: just a choice of morning or afternoon."

165.    Lastly, and in yet another further attempt to confuse the unsuspecting beneficiary, agents were told "(j)ust tell them you have some very important information to get to them."

166.    MMA's "Tips and Hints" read in relevant part:

33



## ACTION POINTS & SCRIPT

5) <u>Tips and Hints –</u>
   a) If they say they are going to an appointment just ask them what time their appointment is. Then offer to leave it in their door, and then go by there at a later time and see if you can catch them at home.
   b) Never give them a yes or no question: just a choice of morning or afternoon
   c) No need to get in a conversation. Just tell them you have some very important information to get to them
   d) Finally, Tell them there are programs in the state of Missouri for people on fixed incomes that they need to be aware of...You are on a fixed income aren't you?. I just need to get you this information.

167.    MMA also provided instructions for "Prospecting for New Clients to Set

Appointments." MMA's instructions were:

- Using the "MMA Provided Script";
- Using "Lead Sheets" to call on Medicare beneficiaries and specifically telling agents not to "leave message on Voice Mail" because MMA knew that such solicitation was illegal:
- Directing agents to use a "GPS System" to find the most efficient way to solicit "Non-Responders";
- Direct agents to "Turn One Visit into Five" by soliciting door-to-door in the area of approved leads; and
- Directing Agents to "Be Resourceful" by using both White Pages Online and InfoUSA Lead Service to find beneficiaries to solicit door-to door.

168.    These instructions read in relevant part:



## Prospecting for New Clients to Set Appointments

1) Script
   a) MMA Provided Scripts
2) Lead Sheets
   a) Set Appointments
   b) Don't leave message on Voice Mail
   c) No Longer in Service
3) Lead Sheets Non-Responders
   a) Enter into GPS System

4) Turn One Visit into Five

6) Be Resourceful....Other Ideas.
   a) White Pages Online
   b) InfoUSA Lead Service

169.    MMA installs the "White Pages" mobile application ("app") on its agents' phones and teaches agents how to use it.  The "White Pages" app allows an agent to input an address to find out the name and approximate age of the residents of that address, or those aged "65+." Once an agent determines that a resident's age indicates that he or she might be Medicare eligible, the agent knocks on the door and utilizes the MAP-selling techniques MMA teaches.

170.    MMA teaches agents to use the "White Pages" app to engage in another bait-and-switch. MMA instructs agents to find a Medicare-aged person (name and address) through the app and approach a neighbor and claim that the White Pages identified person "referred" the agent to the neighbor.

35

171.     In fact, of the 184 MAPs a former MMA Sales Director Patricia Berke sold from September 14, 2016 through September 20, 2017, 140 (or over 76%) of those MAPs were sold as a result of using the White Pages app.

172.     Each one of these MAP/White Pages apps submitted by MMA were false claims for payment of commissions.

173.     By engaging in this fraudulent sales activity, MMA was able to send out "unqualified agents" to illegally sell MA plans in violation of CMS regulations to Medicare beneficiaries and, in turn, obtain commissions that, absent this fraud, it would not have been entitled to.

174.     Despite the clear prohibitions against door-to-door solicitation for MAPs, MMA manager Thomas Madden nevertheless described "door knocking" as a "gray area."

175.     On December 21, 2018, Thomas Madden was promoted by MMA to the position of Director of Client Services and Retention.

176.     Thomas Madden has bragged:  "In all the years I've worked here I have never ever gotten in trouble for knocking on doors because I have never gone in there and start talking about Medicare Advantage."

177.     In regard to the propriety of door knocking, on September 21, 2018 Thomas Madden said:

> I think we're in a situation where during AEP where we really do need to contact as many people as we can – alright – and so you shouldn't feel uncomfortable approaching people with saying, "Hi Mary, I'm Tom. The reason while I'm here is I'm following up on information. I'm here to talk to you about your Medicare we sent you information I'm just following up on the information we had sent to you with regard to Medicare." You will not have people wondering, '**Why did that guy knock on my door**?  And that – and when I came up with that – it changed things. Because now people don't ask me, "Why

36

are you there?" because I told them why I was there. So it should work. The 48-hour thing regarding with regard to scope is good because we haven't been using that anyway…

178.    "Scope" is the "Scope of Appointment." The MMA manager clearly stated that "we (MMA) haven't been using" Scope of Appointment forms.

179.    On October 17, 2008, CMS sent out guidance regarding Medicare Advantage "scope of appointment rules." CMS stated that "MIPPA scope of appointment rules were put in place to protect beneficiaries from being sold Medicare plans that were not within the agreed scope of sales appointment." The guidance reads in relevant part:

**MEMORANDUM**

| | |
|---|---|
| DATE: | October 17, 2008 |
| TO: | Medicare Advantage Organizations<br>Medicare Advantage-Prescription Drug Organizations<br>Cost-Based Contractors<br>Prescription Drug Plan Sponsors<br>Employer/Union-Sponsored Group Health Plans |
| FROM: | Abby L. Block /s/<br>Director, Center for Drug and Health Plan Choice |
| RE: | 2nd Group of Marketing Questions for regulations in CMS 4131-F and CMS 4138-IFC |

**Scope of Appointments**

MIPPA scope of appointment rules were put in place to protect beneficiaries from being sold Medicare plans that were not within the agreed upon scope of the sales appointment. Plans are reminded that this does not have any impact on:

- Plan receipt of enrollment forms from prospective enrollees, or requests to enroll initiated by beneficiaries through means such as in-bound calls to plans asking to enroll telephonically.
- Beneficiary walk-ins to a plan or agent/broker office or similar beneficiary-initiated face-to-face sales event. The plan or agent/broker should complete a scope of appointment form and secure the beneficiaries signature prior to discussing Medicare Advantage or Prescription Drug Benefit plans. Plans and agents/brokers should note on the scope of appointment form that the beneficiary was a walk-in.
- Plans and agents/brokers continue to be able to return beneficiary phone calls or messages as these are not unsolicited.

37

180.     Additionally, the 2014 AHIP training concerning "scope of appointment" states in relevant part:

## Required Practices: Scope of Appointment

☐   Marketing representatives <u>must</u>:
- Market only health care related products during any MA or Part D sales activity or presentation.
- Prior to any marketing appointment (48 hours in advance if practicable), clearly identify the types of product(s) that will be discussed, obtain agreement from the beneficiary and document that agreement.
    - Documentation for appointments must be in writing or may be a recorded oral agreement.
    - For appointments made over the phone, required documentation is a recording of the call.
- During appointments scheduled in response to a reply card, only discuss the products included in the reply card in which the beneficiary has indicated interest.
- A plan sponsor or agent may not agree to the scope on behalf of the beneficiary.

181.     Thus, prior to any appointment, the "marketing representative **must**" obtain agreement prior to any marketing appointment agreement from the beneficiary about the types of products that will be discussed and document that agreement.  MMA's wanton disregard of this required ("**must**"') element in the sales of MAPs is yet another example of MMA's fraudulent business practices.

182.     MMA also provides "scripts" for "cold calls" on Medicare beneficiaries.

183.     MMA sales agents use "door-to-door" solicitation for one reason: to sell the Medicare beneficiary a MAP.

184.     MMA also directs its agents to engage in deliberately misleading sales tactics "At the Door."

38

185. Rather than identify themselves as insurance agents working for an insurance brokerage, MMA agents were told to tell beneficiaries that they were "a resource for (their) clients."

186. MMA told their agents to tell beneficiaries that "Medicare requires anyone you talk to about the changes in Medicare to be licensed with those insurance companies" and that "it takes about a week each year to certify with these companies to qualify" when, in fact, none of MMA's agents were properly certified to sell Medicare Advantage plans.

187. When beneficiaries asked the reasonable question "Who are you and what company do you work for?," MMA directed its agents to say "I'm with a company called MMA which is an independent resource company" when, in fact, MMA is an insurance brokerage.

188. These misleading sales tactics were included in a sales manual and read in relevant part:

c) Who are you and what company do you work for?
   (1) Well as I said I'm (name), I'm with a company called MMA which is an
       independent resource company.  We help people review Medicare
       and how those changes can help when they have future health needs.
   (2) I work for all of the companies that Medicare works with, and as a
       resource, I make sure that you have all the new benefits that are
       available.  It'll just take a minute.

          ACTION POINTS & SCRIPT

## At the Door continued

d) Are you an insurance agent?
   (1) As a resource for my clients, I am there to help my clients with all
       aspects of Medicare including their insurance questions and concerns.
       Medicare requires anyone you talk to about the changes in Medicare
       to be licensed with those insurance companies.  It takes about a week
       each year to certify with these companies to qualify.  That's why
       when you call Medicare the agents cannot go into much detail
       because they are not licensed with the insurance companies.

189.    On November 26, 2018 at 9:55 AM, Wendy Payton, an administrative sales

assistant at MMA and Carefree USA, sent an email to over 100 MMA and Carefree USA sales

agents wherein she stated that "Anyone needing non-responders today, please contact Derek

(Hurt) in our office." Derek Hurt is MMA and Carefree USA's "Specialist" in "Certification." he

document reads in relevant part:

**From:** Wendy Payton
**Sent:** Monday, November 26, 2018 9:55:34 AM

40

**Subject:** Non-Responders

Good morning....  Anyone needing non-responders today, please contact Derek in our office (derekhurt@askmma.com).  Thank you.


*Wendy*

Wendy Payton
MMA
9800 Metcalf Avenue
Suite 100


Overland Park, KS 66212
913.649.0300

190.    In MMA parlance, "Non-Responders" are Medicare beneficiaries who have received unsolicited information from MMA by mail, inviting them to indicate that they would like information on Medicare Advantage plans, but who have not responded.

191.    MMA provides Non-Responder lists to MMA and Carefree USA sales agents so that they have addresses of target Medicare beneficiaries and can coordinate soliciting them door-to-door while agents are in the area selling Medicare Advantage plans to responding beneficiaries.

192.    Consequently, like its "sister company" MMA, Aetna's wholly-owned subsidiary Carefree USA – that shares office space with Aetna's other wholly-owned subsidiary Carefree Solutions USA– is violating rules, regulations and laws specifically designed to prevent door-to-door solicitation for Medicare Advantage business.

193.    MMA also encourages, if not demands, that agents switch beneficiaries to MA plans sponsored by the insurance companies of MMA's choice.

194.    Promotion of plan-switching for reasons other than the best interests of the beneficiary is prohibited by CMS. 42 CFR 422.2268 (e) and (j) and 423.2268 (e) and (j) require

41

that sponsors ensure that agents remain neutral with respect to the various plans offered when assisting beneficiaries in objective assessments of those individuals' needs and options that will meet those needs.

195. Nonetheless, Sabrina Mundy, MMA's director of compliance, instructed agents "If you go into a house where someone with Human Gold Plus I'm going to automatically switch them to Aetna. If I go into a Coventry house, I'm going to switch them to Humana. You have to have a plan of action (when you go into a house) what you are going to switch. All you are doing is switching from one company to your company. It's just like life insurance."

196. Mundy further stated "if they're already on an MAPD plan, put them on another one" and "just do what you can do to switch (beneficiaries) from plan to plan."

197. In regard to the effect of switching beneficiaries from plan to plan, Mundy stated that "you can't do anything to hurt any of these of people (beneficiaries). Nothing."

198. This was a patently untrue statement as beneficiaries who have their plans changed can discover that the medications they are taking and the doctors they are treating with are not covered by the new plan that was sold to them.

199. Concerning agents that were not licensed to sell UnitedHealthCare plans, "until you get you get your United maybe you split the commission with someone (an MMA agent) that does have United." This was an explicit direction for MMA agents to sell plans that they were not licensed to sell.

200. Mundy added "that you can't announce that to the world because we are trying to be legal" even though such a scheme was illegal.

42

201.    "Churning" results in MMA receiving a higher commission than it would if a beneficiary renewed his or her current plan. MMA told agents to "do what you can do to switch from plan to plan," but to "be discreet." Agents were expected to push what MMA wanted pushed.

202.    In addition, because of its close relationship with Aetna Coventry, Aetna plans were designated as the "go-to" as Aetna was funding MMA's expansion into new markets including, but not limited to, Texas and Louisiana.

203.    Until 2014, James Fagan worked as the Director of National Sales for Coventry Health Care, an Aetna company. In 2014, he became the president and executive director of Carefree Insurance Services, Inc., also an Aetna company. Carefree Insurance is the company that shared an office with Carefree USA in Doral, Florida. Mr. Fagan discussed with his Aetna supervisor, a senior vice president, who asked Fagan "if we can get (MMA) to help us with this market, that market."

204.    Upon information and belief, that senior vice president was Armando Luna. Mr. Luna is currently the Head of Individual Medicare Sales and Marketing at Aetna.

205.    Fagan said that there is "no other agency" like MMA in the country and that "hands down" agencies like MMA "don't exist." With that information, Aetna, through its wholly owned subsidiary Carefreee Insurance, invested marketing funds in MMA to open offices throughout the country including Houston, Texas and Doral, Florida.

206.    Then MMA-president Gary Berke told Fagan that Aetna "would have to dig in its pockets" to help fund new offices and the two of them would need to discuss "what percentage is [Berke's] money and what percentage is Aetna's."

43

207.     According to Fagan, "there is always a discussion about investment in lead support and advances" between MMA and Aetna.

208.     When discussing an expansion in Texas, the focus was on "low-income" senior sales and that, compared to the Kansas and Missouri markets, Texas has "more low-income (seniors) than we have eligibles."

209.     Likewise, while opening a new office, Sabrina Mundy said that "because we don't have the new leads so we have to work the areas that we know are low income." MMA has also directed its agents to sell MAPs at homeless shelters, soup kitchens and laundromats.

210.     In this same discussion, Berke recounted problems MMA had when selling MAPs in the Dallas, Texas area saying that "we (MMA) got shut down fast" due to "so many complaints" of illegal Medicare Advantage marketing.

211.     As of June 2019, James Fagan was no longer employed by Aetna.

212.     In November, 2015, Berke directed an MMA manager "to push (the plans) I want you to push because I need to make deals with suppliers (insurance carriers). Right now, I'm going to Aetna for money…What I need is I need support because they (Aetna) are always coming at me to have a national footprint and open up more branches. And I'd like to accommodate that. But show me the money."

213.     Such "push(ing)" of plans that are preferred by the broker is in violation of 42 CFR 422.2268 (e) and (j) and 423.2268 (e) and (j).

214.     Such "push(ing)" of plans is also a violation of the Anti-Kickback Statute because such steering of business to Aetna is a result of payments made to MMA from Aetna's wholly owned subsidiary Carefree Insurance. 42 U.S.C. § 1320a-7b(b).

44

**Specific Examples of Applications that Resulted in False Claims**

215.    The following are mere examples of how the MMA process worked and continues to work.  Holt, when she worked for MMA, and all of the agents who have worked and do work for MMA, would work during the week to obtain signed applications—using the various non-compliant sales techniques MMA taught them—and then were required to appear in person at Friday meetings to turn in their applications.  MMA would pay the agents at the Friday meeting for the applications they turned in, in the amount that the agent had agreed to accept per application.  In Holt's case, she agreed to accept between $165 and $190 per new-to-Medicare application, which MMA would pay at the Friday meetings.

216.    MMA paid its agents the agreed-upon rates knowing MMA stood to obtain more than double these amounts in CMS commissions.  Not only that, MMA would charge its agents back, oftentimes without the agents' knowledge, for applications that MMA had sent agents to obtain knowing that other agents were responsible for them.  MMA kept track of these "chargebacks" which monies MMA then claimed the agents owed it in order to keep the agents in its service.

217.    These are specific examples of MAP applications and resulting commissions that resulted in false claims on the government:

- On November 12, 2009, MMA agent Darrel Ohrenberg (based in Kansas City, Missouri) sold a client in Springfield, Missouri a UnitedHealthcare MAP. On November 13, 2009, Ohrenberg turned in this application for enrollment to MMA, who, in turn, submitted the application to UnitedHealthcare, and ultimately to CMS for verification and payment of a commission to MMA.

45

- On January 13, 2011, MMA agent Darrel Ohrenberg (based in Kansas City, Missouri) sold a client in Kansas City, Missouri a UnitedHealthcare MAP. On January 14, 2011, Ohrenberg turned in this application for enrollment to MMA, who, in turn, submitted the application to UnitedHealthcare, and ultimately to CMS for verification and payment of a commission to MMA.

- On March 24, 2011, MMA agent Darrel Ohrenberg (based in Kansas City, Missouri) sold a client in Newburg, Missouri a UnitedHealthcare MAP. On March 25, 2011, Ohrenberg turned in this application for enrollment to MMA, who, in turn, submitted the application to UnitedHealthcare, and ultimately to CMS for verification and payment of a commission to MMA.

- On November 18, 2015, Relator Holt sold a client in Raytown, Missouri an Aetna Coventry MAP. That following Friday, November 20, 2015, Holt turned in this application for enrollment to MMA, who, in turn submitted the application to Aetna Coventry, and ultimately to CMS for verification and payment of a commission to MMA.

- On December 8, 2015, Relator Holt sold a client in Grandview, Missouri an Aetna Coventry MAP. That following Friday, December 11, 2015, Holt turned in this application for enrollment to MMA, who, in turn, submitted the application to Aetna Coventry, and ultimately to CMS for verification and payment of a commission to MMA.

- On June 29, 2016, Relator Holt sold a client in Kansas City, Missouri a new-to-Medicare Humana MAP. That following Friday, July 1, 2016, Holt turned in this application for enrollment to MMA, who, in turn, submitted the application to Humana, and ultimately to CMS for verification and payment of a commission to MMA.

46

- On September 1, 2016, Relator Holt sold a client in Excelsior Springs, Missouri a new-to-Medicare Aetna Coventry MAP. That following Friday, September 2, 2016, Holt turned in this application for enrollment to MMA, who, in turn, submitted the application for enrollment to Aetna Coventry, and ultimately to CMA for verification and payment of a commission to MMA.

- On October 11, 2016, Relator Holt sold a client in Kansas City, Missouri a new-to-Medicare Aetna Coventry MAP. That following Friday, October 14, 2016, Holt turned in this application for enrollment to MMA, who, in turn, submitted the application to Aetna Coventry, and ultimately to CMS for verification and payment of a commission to MMA.

- On November 12, 2015, Relator Hedenkamp sold a client in Basehor, Kansas an Aetna Coventry MAP.  That following Friday, November 13, 2015, Hedenkamp turned in this application for enrollment to MMA, who, in turn, submitted the application to Aetna Coventry, and ultimately to CMS for verification and payment of a commission to MMA.

- On January 15, 2016, MMA agent Hedenkamp sold a client in Belton, Missouri an Aetna Coventry MAP. On that same day, January 15, 2016, Hedenkamp turned in this application for enrollment to MMA, who, in turn, submitted the application to Aetna Coventry, and ultimately to CMS for verification and payment of a commission to MMA.

- On February 25, 2016, MMA agent Hedenkamp sold a client in Kansas City, Missouri an Aetna Coventry MAP. On that same day, February 26, 2016, Hedenkamp turned in this application for enrollment to MMA, who, in turn, submitted the application to Aetna Coventry, and ultimately to CMS for verification and payment of a commission to MMA.

47

- On November 1, 2016, MMA agent Hedenkamp sold a client in Lone Jack, Missouri a Coventry MAP. That following Friday, November 4, 2016, Hedenkamp turned in this application for enrollment to MMA, who, in turn, submitted the application to Coventry, and ultimately to CMS for verification and payment of a commission to MMA.

- On November 7, 2016, MMA agent Hedenkamp sold a client in Kansas City, Kansas a Coventry MAP. That following Friday, November 11, 2016, Hedenkamp turned in this application for enrollment to MMA, who, in turn, submitted the application to Coventry, and ultimately to CMS for verification and payment of a commission to MMA.

- On June 22, 2018, MMA agent Tracy Ross (based in Springfield, Missouri) sold a client in Springfield, Missouri an Aetna Coventry MAP. On that same day, Ross turned in this application for enrollment to MMA, who, in turn, submitted the application to Aetna Coventry, and ultimately to CMS for verification and payment of a commission to MMA. Aetna Coventry's payment of a commission in this instance was a kickback paid to MMA as Aetna Coventry knew that MMA's sales agents were not either properly certified to sell Medicare Advantage plans and were violating CMS' regulations governing the sale of MAPs to Medicare beneficiaries.

- On October 18, 2018, MMA agent Tracy Ross (based in Springfield, Missouri) sold a client in Branson, Missouri a Humana MAP. On October 19, 2018, Ross turned in this application for enrollment to MMA, who, in turn, submitted the application to Humana, and ultimately to CMS for verification and payment of a commission to MMA. Humana's payment of a commission in this instance was a kickback paid to MMA as Humana knew that MMA's sales agents were not either properly certified to sell

48

Medicare Advantage plans and were violating CMS' regulations governing the sale of MAPs to Medicare beneficiaries.

- On November 7, 2018 MMA agent Tracy Ross (based in Springfield, Missouri) sold a client in Republic, Missouri an Aetna Coventry MAP. On November 9, 2018, Ross turned in this application for enrollment to MMA, who, in turn, submitted the application to Aetna Coventry, and ultimately to CMS for verification and payment of a commission to MMA. Humana's payment of a commission in this instance was a kickback paid to MMA as Aetna Coventry knew that MMA's sales agents were not either properly certified to sell Medicare Advantage plans and were violating CMS' regulations governing the sale of MAPs to Medicare beneficiaries.

- On November 20, 2018, MMA agent Tracy Ross (based in Springfield, Missouri) sold a client in Billings, Missouri an Aetna Coventry MAP. On November 23, 2018, Ross turned in this application for enrollment to MMA, who, in turn, submitted the application to Aetna Coventry, and ultimately to CMS for verification and payment of a commission to MMA. Humana's payment of a commission in this instance was a kickback paid to MMA as Aetna Coventry knew that MMA's sales agents were not either properly certified to sell Medicare Advantage plans and were violating CMS' regulations governing the sale of MAPs to Medicare beneficiaries.

- On November 29, 2018, MMA agent Tracy Ross (based in Springfield, Missouri) sold a client in Billings, Missouri a Blue KC MAP. On November 30, 2018, Ross turned in this application for enrollment to MMA, who, in turn, submitted the application to Blue KC, and ultimately to CMS for verification and payment of a commission to MMA. Blue

49

KC's payment of a commission in this instance was a kickback paid to MMA as Blue KC knew that MMA's sales agents were not either properly certified to sell Medicare Advantage plans and were violating CMS' regulations governing the sale of MAPs to Medicare beneficiaries.

- On November 29, 2018, MMA agent Tracy Ross (based in Springfield, Missouri) sold a client in Billings, Missouri a UnitedHealthcare MAP. On November 30, 2018, Ross turned in this application for enrollment to MMA, who, in turn, submitted the application to UnitedHealthcare, and ultimately to CMS for verification and payment of a commission to MMA. UnitedHealthcare's payment of a commission in this instance was a kickback paid to MMA as UnitedHealthcare knew that MMA's sales agents were not either properly certified to sell Medicare Advantage plans and were violating CMS' regulations governing the sale of MAPs to Medicare beneficiaries.

- On December 1, 2016, MMA agent Kimberly Harvey (based in Kansas City, Missouri) sold a client in Kansas City, KS a Blue KC MAP. On December 2, 2016, Harvey turned in this application for enrollment to MMA, who, in turn, submitted the application to Blue KC, and ultimately to CMS for verification and payment of a commission to MMA.

- On November 14, 2017, MMA agent Kimberly Harvey (based in Kansas City, Missouri) sold a client in Tonganoxie, Kansas an Aetna Coventry MAP. On November 17, 2017, Harvey turned in this application for enrollment to MMA, who, in turn, submitted the application to Aetna Coventry, and ultimately to CMS for verification and payment of a commission to MMA.

- On February 6, 2017, MMA agent Kimberly Harvey (based in Kansas City, Missouri) sold a client in Kansas City, Missouri UnitedHealthcare MAP. On February 10, 2017, Harvey turned in this application for enrollment to MMA, who, in turn, submitted the application to UnitedHealthcare, and ultimately to CMS for verification and payment of a commission to MMA.

- On February 16, 2017 MMA agent Kimberly Harvey (based in Kansas City, Missouri) sold a client in Warrensburg, Missouri an Aetna Coventry MAP. On February 17, 2017, Harvey turned in this application for enrollment to MMA, who, in turn, submitted the application to Aetna Coventry, and ultimately to CMS for verification and payment of a commission to MMA.

- On April 13, 2017, MMA agent Kimberly Harvey (based in Kansas City, Missouri) sold a client in Wichita, Kansas UnitedHealthcare MAP. On April 14, 2017, Harvey turned in this application for enrollment to MMA, who, in turn, submitted the application to UnitedHealthcare, and ultimately to CMS for verification and payment of a commission to MMA.

- On May 30, 2017, MMA agent Kimberly Harvey (based in Kansas City, Missouri) sold a client in Maryville, Missouri a UnitedHealthcare MAP. On June 2, 2017, Harvey turned in this application for enrollment to MMA, who, in turn, submitted the application to UnitedHealthcare, and ultimately to CMS for verification and payment of a commission to MMA.

218.    Each of these applications and the thousands of others obtained by MMA agents were submitted to CMS were false claims because they were premised on the agent being properly Medicare Advantage certified and carrier certified, which MMA agents were not.

219.    CMS would never have authorized the payment of commissions or kickbacks funded by federal dollars to MMA knowing that MMA agents were not properly certified.

220.    Additionally, CMS would never have authorized the payment of commissions or kickbacks funded by federal dollars to MMA knowing that MMA had directed its agents to wantonly disregard CMS regulations regarding the sale of MAPs to Medicare beneficiaries.

### Pre-AEP Solicitation of MAP Applications by MMA

221.    Typically, enrollment in Medicare programs is limited to October through December—this is what is known as the Annual Enrollment Period or "AEP." If an individual is currently receiving Medicare benefits of any kind, and wants to switch to a new plan—for example, from original Medicare to a MAP or from one MAP to another—that individual must do so during AEP.

222.    CMS regulations declare that "(b)rokers and agents under contract to MA organizations **may not accept or solicit submission of paper enrollment forms prior to the start of AEP**."

223.    Furthermore, "MA organizations and their brokers and agents also should remind beneficiaries that they **cannot submit enrollment requests prior to the start of AEP**."

224.    Importantly, CMS requires that "(p)aper AEP requests received prior to the start of AEP for which there is an indication of sales agent or broker involvement in the submission of the request (i.e., the name or contact information of a sales agent or broker) **must** be investigated

52

by the organization for compliance with the requirements in the Medicare Marketing

Guidelines." Medicare Managed Care Manual. Chapter 2—Medicare Advantage Enrollment and

Disenrollment—40 Enrollment Procedures (emphasis supplied).

225.     MMA's Director of Compliance Sabrina Mundy, however, directly trained agents

to solicit applications prior to AEP and ordered agents to not permit such applications to be

dated, so that MMA could post-date them to appear compliant.

226.     Ms. Mundy further instructed agents to obtain signatures on the applications and

seal them in envelopes to be sent to MMA, and warned that the beneficiaries had to put the

applications in the mail. In order to assure that the applications were actually mailed, Mundy

advised agents to put them in the beneficiaries' mailboxes themselves. Once received at MMA,

MMA would open the envelopes and date the applications with a date after October 15, thus

within AEP.

227.     During her explanation of this fraudulent scheme Ms. Mundy added the

disclaimers "you're not hearing this from me," "you are not hearing this," and she was "the Man

in Black" that would cause all the MMA agents to forget it was she who told them to engage in

this fraudulent scheme.

228.     MMA would pay commissions to its agents for these fraudulently obtained MAPs

every Friday during the pre-AEP marketing period.

229.     Each pre-AEP application that resulted in the payment of commissions to MMA

constitutes a false claim.

**Specific Allegations Against Aetna, Humana, UnitedHealthcare, and Blue KC**

53

230.    Medicare Advantage plan sponsors receive money from CMS for each beneficiary that enrolls in their plan.

231.    The average profit margin for plan sponsors is 15% of the total amount that CMS pays to the plan sponsors for providing the MAP.

232.    In Missouri, the profit margin for MAP plans was over 20% in 2016 and 22.5% in 2017.

233.    Medicare Advantage business is extremely profitable for Defendants Aetna, Humana, UnitedHealthcare, and Blue KC.

234.    In 2016, the State of Missouri reported that CMS paid over $530 million in premiums to Aetna, Anthem, Coventry (Aetna), and Humana for 53,247 Medicare Advantage beneficiaries:

2016 Supplemental Data for
Accident and Health
Individual Medicare Advantage

| ID | Company | Market Share | Number of Insureds | Direct Premium Written | Direct Premium Earned | Dividends Paid | Direct Losses Paid | Direct Losses Incurred | Loss Ratio |
|---|---|---|---|---|---|---|---|---|---|
| 1 | AETNA LIFE INSURANCE COMPANY | 4.35% | 1695 | $23,094,129.00 | $23,378,025.00 | $0.00 | $18,269,631.00 | $18,767,963.00 | 80.28% |
| 2 | ANTHEM INSURANCE COMPANIES INC | 5.06% | 2644 | $26,841,189.00 | $26,912,220.00 | $0.00 | $20,621,438.00 | $19,986,080.00 | 74.26% |
| 3 | COVENTRY HEALTH AND LIFE INSURANCE COMPANY | 56.01% | 30765 | $297,259,767.00 | $297,259,767.00 | $0.00 | $229,774,999.00 | $240,750,381.00 | 80.99% |
| 4 | HEALTHY ALLIANCE LIFE INSURANCE COMPANY | -0.01% | 0 | $-51,197.00 | $-51,197.00 | $0.00 | $-24,534.00 | $-24,534.00 | 47.92% |
| 5 | HUMANA INSURANCE COMPANY | 34.60% | 18143 | $183,625,450.00 | $183,625,450.00 | $0.00 | $142,346,444.00 | $142,216,468.00 | 77.45% |
| 6 | PYRAMID LIFE INSURANCE COMPANY | 0.00% | 0 | $0.00 | $0.00 | $0.00 | $-6,092.00 | $-6,092.00 | N/A |
| Missouri Totals | | 100.00% | 53,247 | $530,769,338 | $531,124,265 | $0 | $410,981,886 | $421,690,266 | 79.40% |

54

235.    Of that $530 million in premiums paid for by CMS, the Defendants Aetna, Blue

KC, and Humana paid $410 million in "direct losses" meaning that the Defendants Aetna, Blue

KC, and Humana collectively made a profit of $120 million from Missouri Medicare Advantage

plans.

236.    In 2017, the State of Missouri reported that CMS paid over $568 million in

premiums to Aetna, Anthem, Coventry (Aetna), and Humana for 55,923 beneficiaries:

**2017 Supplemental Data for Accident and Health Individual Medicare Advantage**

| ID | Company | Market Share | Number of Insureds | Direct Premium Written | Direct Premium Earned | Dividends Paid | Direct Losses Paid | Direct Losses Incurred | Loss Ratio |
|---|---|---|---|---|---|---|---|---|---|
| 1 | AETNA LIFE INSURANCE COMPANY | 4.98% | 2739 | $28,352,441.00 | $29,029,585.00 | $0.00 | $23,563,545.00 | $23,785,087.00 | 81.93% |
| 2 | ANTHEM INSURANCE COMPANIES INC | 4.25% | 2529 | $24,181,871.00 | $23,968,467.00 | $0.00 | $19,840,078.00 | $19,344,329.00 | 80.71% |
| 3 | COVENTRY HEALTH AND LIFE INSURANCE COMPANY | 61.17% | 33421 | $347,936,914.00 | $347,575,118.00 | $0.00 | $272,250,482.00 | $271,228,585.00 | 78.03% |
| 4 | HEALTHY ALLIANCE LIFE INSURANCE COMPANY | -0.01% | 0 | $-48,564.00 | $-48,564.00 | $0.00 | $0.00 | $0.00 | 0.00% |
| 5 | HUMANA INSURANCE COMPANY | 29.60% | 17234 | $168,389,139.00 | $168,389,139.00 | $0.00 | $127,671,650.00 | $126,545,380.00 | 75.15% |
| Missouri Totals | | 100.00% | 55,923 | $568,811,801 | $568,913,745 | $0 | $443,325,755 | $440,903,381 | 77.50% |

237.    Of that $568 million of premiums paid for by CMS, Defendants Aetna, Blue KC,

and Humana paid $443 million in "direct losses" meaning that Defendants Aetna, Blue KC, and

Humana made a profit of $128 million from Medicare Advantage plans.

238.    In sum, from 2016 to 2017 Defendants Aetna, Blue KC and Humana made a total

profit of $248 million—or nearly a quarter of a billion dollars—from CMS in **<u>Missouri alone</u>**.

55

239.    Consequently, the more beneficiaries plan sponsors enroll through brokerages like

MMA and Carefree USA the more profit their Medicare Advantage policies generate.

240.    42 CFR § 422.504(h)(1) states:

§ 422.504    Contract provisions.
    The contract between the MA organi-
zation and CMS must contain the fol-
lowing provisions:

    (h) *Requirements of other laws and reg-
ulations.* The MA organization agrees
to comply with–
    (1) Federal laws and regulations de-
signed to prevent or ameliorate fraud,
waste, and abuse, including, but not
limited to, applicable provisions of

Federal criminal law, the False Claims
Act (31 U.S.C. 3729 et. seq.), and the
anti-kickback    statute    (section
1128B(b)) of the Act); and

241.    As "MA organizations" Defendants Aetna, Humana, UnitedHealthcare, and Blue

KC have all signed contracts with CMS committing that they will comply with "Federal laws

and regulations designed to prevent or ameliorate fraud, waste, and abuse, including but not

limited to, applicable provisions of Federal criminal law, the False Claims Act (31 U.S.C. 3729

et. seq.) and the anti-kickback statute (section 1128B(b)) of the Act)."

242.    Section 1128B of the Social Security Act is also referred to as 42 U.S.C 1320a-

7b.

243.    On September 11, 2017, Relator contacted Aetna, Humana, UnitedHealthcare,

and Blue KC were on notice of MMA's illicit sales practices which included door-to-door

knocking, Medicaid fraud, use of the "White Pages" application on phones to target Medicare

beneficiaries, and "churning" of Medicare Advantage policies.

56

244.    For example, Relator sent a copy of the Director of Aetna's Medicare Compliance

Program John Wells (MedicareFDR@aetna.com), Medicare compliance at Blue KC

(MACompliance@BlueKC.com), a Medicare compliance analyst at Humana

(rranzau@humana.com), and the Director of the Compliance Investigations Unit at

UnitedHealthcare (john_kaufman@uhc.com).

245.    In the letter, the Relator notified the carriers of the following, among other things:

**MMA's PUBLIC VIOLATIONS:**

- Prohibited door-knocking, non-compliant lead cards (re-using lead cards, using unsigned lead cards, and lead cards that were never even sent out to prospective clients), unlawful phone solicitations, and general institutionalized misuse (in direct violation of insurance solicitation rules as required by CMS and local/state governments), including ignoring "Do Not Call" registries.
- Targeting existing MMA clients for churning business by placing them into subpar plans simply to generate additional commissions, overrides, and bonuses for MMA and uplines. (E.g. Moving dual-eligible beneficiaries from SNP plans to inferior plans that require the payment of premiums/copays by the beneficiary.)
- Handing out CMS & HIPPA-protected client lists placed with other carriers and mandating that agents target those clients and move them to another carrier.
- Bait-and-switch techniques taught and encouraged for both phone and door-to-door solicitation, encouraging agents to represent themselves as a "resource" to help beneficiaries qualify for federal and state subsidies for healthcare benefits and prescription drug assistance to then sell them an MAPD plan.
- Misuse and abuse of the MORx State Pharmacy Assistance Program (MO SPAP) to secure the necessary Special Election Period (SEP) qualifier to write beneficiaries outside of the Annual Enrollment Period (AEP) when they did not qualify (instructing agents to reflect that individuals were participants in the MO-SPAP, whether that was the case or not). The MO-SPAP program was discontinued in July 2017 adversely impacting over 60,000 low-income MO beneficiaries, leaving many without their needed prescription subsidy. Many competitors and industry veterans blame MMA for this abuse and for causing the discontinuation of this needed plan for low-income beneficiaries.
- Taught and endorsed the use of the www.whitepages.com phone app by agents while in the field targeting seniors ("65+" residents) for non-compliant door-to-door solicitation.

246.    As of September 11, 2017, all the carriers were put on notice that MMA engaged

in illegal conduct that was specifically prohibited by regulations governing how MAPs could be

marketed.

57

247.     Humana, UnitedHealthcare, and Blue KC all acknowledged receipt of the letters but did little else to determine the merits of the allegations contained in the letter.

248.     Aetna's initial response was more significant because it hired outside counsel Emily Moseley to investigate Relator's complaints.

249.     Ms. Moseley met with the Relator at which point she informed her that MMA agents were not properly Medicare-Advantage certified and that, as a result, MMA can and does encourage and promote the use of unlawful sales techniques that were described in the letter.

250.     Upon information and belief, this caused Aetna to demand that a number of MMA's agents be recertified—but Aetna did nothing to ensure that those certifications were obtained under any better conditions than they were originally.

251.     Furthermore, Aetna did nothing in 2018 to ensure that the certification tests were administered and passed under the proper conditions.

252.     On February 20, 2018, Relator Holt sent another letter to the carriers and the Missouri Department of Insurance outlining MMA's illegal conduct.

253.     In this letter, Relator Holt raised the issues of testing fraud, failure to date Scopes of Appointment, distribution of unsigned lead cards, use of outdated lead cards, "churning" of Medicare Advantage plan enrollments, and fraud on the "Low-Income Subsidy" program:

- MMA's Directors/Managers, including Kirk Anderson, CEO, Roger Lund, Director Sales Operations/Agent Support, and other MMA-hired employees routinely took agents' certifications and re-licensing tests for MMA agents including: AHIP, carrier certifications, and renewal of state insurance licenses.

- All agents were told by MMA owners/managers to not date either the client applications or Scope of Appointments until they were turned-in to the office where office personnel would date them ensuring all contracts were submitted within the 48-hour CMS rule.   Once MMA discovered this was reported through an interview from our complaint in Sept., 2017 MMA owners/managers issued an edict instructing all agents to date their contracts/Scopes and submit within 48-hours to MMA's offices. This edict, from what we understand, came roughly three (3) months later, in Dec., 2017, after eleven (11) years of MMA's institutionalized CMS violation.

58

- MMA continued to hand-out unsigned and duplicated lead cards during 2017/2018 (after our departure and under the sole direction of The Andersons) naturally ensuring their agents rewrite existing MMA clients. The end result is a charge-back to the unsuspecting rewriting agent (while MMA was still paid by CMS/Carriers for a plan-to-plan change) which further indentures agents to produce 'for free' for MMA to clear-up that debt. Most importantly it ensured client plan churning for MMA and continued forced production by the agent for the chargeback and more consumer misconduct in the field.

- The "4-Corner Door-Knocking Strategy" was taught by former Owner & Sales Director, Tricia Berke (prior to selling her interest in MMA on 1/1/17) but is still in practice since The Berke's departure under The Anderson's regime. In essence, the agent is given a (signed or unsigned) lead card and is instructed to use that card to solicit the lead card recipient first but then solicit both homes adjacent to the lead card's address and the two homes across the street. MMA agents were instructed to show the neighbor's lead card to the prospective client/neighbor and tell them they'd placed their neighbor in a plan (whether they had or not). The agents were then instructed to use that same lead card as an 'introduction' to the neighbors and instructed to tell the lead card's neighbors that their neighbor (the person named on the lead card) had sent them over (whether they had or not) "to see if I can help you, too".

- Additional instances of targeting carriers for churning included agents being told not to write Humana on 9/30/16, on the eve of 2016/2017 AEP. Each agent received a white banker's box with their name on it and filled with 2017 applications appropriate for the agents' certifications which included the agents' previously-placed Humana client lists. These lists were *the first full-client lists*, including client addresses and phone numbers, we'd ever seen and were only distributed to target existing MMA-held Humana contracts for churning into another plan. This decision was made by Gary Berke and justified as retribution since Humana, who was in process of a potential merger with Molina, had not returned Berke's calls nor included him as an 'insider' to the merger. (Several agents have kept these Humana target lists and welcome an opportunity to present them.)

- Another incident of instructional-churning occurred at the Mandatory Friday Sales Meeting on 12/8/2017, under The Anderson's regime. Agents/Managers were instructed to write all Blue KC business and list the SEP as Low-Income Subsidy (LIS) regardless of whether the client qualified or not since, agents were told, "BKC won't check it".

254.     Despite Aetna's purported investigation into MMA and its subsequent investment

into MMA's business through Carefree USA, it has done nothing to stop further illegal conduct

at MMA and Carefree USA.

255.     In fact, after receipt of the September 11, 2017 and the February 20, 2018 letters,

Aetna invested in MMA through its wholly-owned subsidiary Carefree Insurance, Inc.

256.     None of the MA organization Defendants (Humana, UnitedHealthcare, Aetna, and

Blue KC) conducted any investigation into allegations raised in the February 20, 2018 letter.

59

257.    CMS has repeatedly made it clear that MA organizations "must oversee downstream entities to ensure agents/brokers abide by all applicable state and federal laws, regulations and requirements."

258.    CMS's carefully chosen words pertaining to MA organizations' responsibilities towards sales agents and brokers ("must oversee") leave no room for interpretations about what the MA organizations responsibilities were and are.

259.    Furthermore, the Affordable Care Act imposed an obligation on MA organizations to report and return any overpayments that they discover on their own. *See* 42 U.S.C. § 1320a-7k(d)(1).

260.    All of the defendant MA organizations willfully turned a blind eye to their responsibility to "oversee" and investigate its downstream entity despite CMS's clear direction that it "must" do so.

261.    Here, in two separate letters Relator Holt told the MA organizations that MMA was violating "applicable state and federal laws, regulations and requirements."

262.    Additionally, although the State Departments of Insurance in both Kansas and Missouri were charged with investigating the Relator's complaints, neither State conducted any investigation whatsoever of Relator's complaints.

263.    No investigation occurred even though on January 19, 2017, or over a year before Relator raised their concerns, the Kansas Department of Insurance ("KID") "created a file" for MMA related to MMA "agents selling Medicare Advantage plans by going door-to-door…targeting seniors in low-income housing."

60

264. KID's investigation showed that "the Agents did not have permission to visit (the beneficiaries) nor did they get permission from the housing facility to contact any of their residents."

265. KID's investigation further showed that "it was difficult to show a pattern of misrepresentation…due to the length of time the Agents were licensed and the amount of complaints on file."

266. KID concluded its investigation pledging "if we continue to receive complaints involving (MMA) agents or MMA" KID would investigate the complaints.

267. Despite KID's own pledge, Relator's complaints were not investigated.

268. Nevertheless, all of the defendant MA organizations continue to conduct business with MMA and thus profit from their illegal sales practices.

269. Consequently, any commissions paid to MMA by any of the MA organization defendants from September 11, 2017 onwards were kickbacks paid to MMA by the MA organization defendants in exchange for Medicare Advantage contracts.

270. These MA organization paid kickbacks, in the guise of "commissions," were, and are, funded by the federal government. *See* April 25, 2007 Medicare Managed Care Manual ("MA organizations must inform all related entities, contractors and subcontractors, first tier and downstream entities that payments they receive are, in whole or in part, from Federal funds.").

271. Furthermore, according to CMS regulations, plan sponsors "are responsible for ensuring compliance CMS's current marketing regulations and guidance." This includes "monitoring and overseeing the activities of their subcontractors, downstream entities, and/or delegated entities." If CMS "finds that plan sponsors failed to comply with the applicable rules

61

and guidance, CMS may take compliance and/or enforcement actions, including, but not limited to intermediate sanctions and/or civil money penalties."

272.    In order to become eligible to be a plan sponsor, all plan sponsors sign a "Part C Application Certification ("Certification").

273.    Aetna, UnitedHealthcare, Humana, and Blue KC have all executed the Certification.

274.    The signatory ("Plan Signatory") to this Certification must certify that s/he is "an authorized representative, officer, chief executive officer, or general partner of the business organization that is applying for qualification to enter into a Part C contract."

275.    Furthermore, the Plan Signatory agrees to the following:

> 3. I agree that if my organization meets the minimum qualifications, is Medicare-approved, and my organization enters into a Part C contract with CMS, I will abide by the requirements contained in Section 3 of this Application and provide the services outlined in my application.

276.    "Section 3" of the Application reads in relevant part that "Applicant agrees to adhere to all marketing requirements in 422.2260 through 422.2276 of the Medicare Marketing Guidelines."

277.    Relator's September 11, 2017 letter to the Defendants outlined numerous violations of the marketing requirements "in 422.2260 through 422.2276 of the Medicare Marketing Guidelines" including, but not limited to, prohibited door-to-door solicitation of beneficiaries for MAPs. The 2018 Medicare Communications and Guidelines reads in relevant part:

**40.2 – Marketing Through Unsolicited Contacts**
42 CFR §§ 422.2268(b)(13), 423.2268(b)(13)

Plans/Part D sponsors may not:
- Use door-to-door solicitation, including leaving information such as a leaflet or flyer at a residence;
- Approach potential enrollees in common areas (e.g., parking lots, hallways, lobbies, sidewalks, etc.); or
- Use telephonic solicitation, including leaving electronic voicemail messages.

278. Furthermore, the 2018 Medicare Marketing Guidelines—as well as previous years' Medicare Marketing Guidelines—also require the that plan sponsors "must oversee downstream entities to ensure agents/brokers abide by all the applicable state and federal laws, regulations, and requirements." The 2018 Medicare Marketing Guidelines reads in relevant part:

**110.3 – Plan/Part D Sponsor Oversight**
42 CFR §§ 422.504(l), 422.2272(c)-(d), 422.2274, 423.2272(c)-(d), 423.505(l), 423.2274

Plans/Part D sponsors must oversee downstream entities to ensure agents/brokers abide by all applicable state and federal laws, regulations, and requirements. Plans/Part D sponsors are required to:
- Ensure agents/brokers are properly licensed and appointed, per individual state requirements;
- Report to the state where agent is appointed, the termination of and agent/broker including the reason for termination if state law requires;
- Report to CMS Account Managers all enrollments made by unlicensed agent(s) and report for-cause terminations of an agent/broker to CMS.
- Provide training and testing that meets CMS' requirements as found in the Agent and Broker Training and Testing Guidelines;

279. Neither MMA nor its "sister company" Carefree USA is abiding by "all applicable state and federal laws, regulations, and requirements."

280. Aetna, UnitedHealthcare, Humana, and Blue KC have therefore falsely certified that they are abiding by the "requirements contained in Section 3 of the Application…"

281. Despite their receipt of allegations that MMA wantonly disregarded regulations aimed at protecting vulnerable beneficiaries, all of the carrier Defendants continue to conduct business with MMA and Carefree USA and, in doing so, profit from the Medicare Advantage

63

applications submitted by both MMA and Carefree USA that are the byproduct of the illegal conduct outlined in the Relator's September 11, 2017 letter.

282.    Defendants Aetna, UnitedHealthcare, Humana, and Blue KC were put on notice as of September 11, 2017—if not sooner—about MMA's illegal activity and continued to pay kickbacks, in the guise of "commissions," to MMA in exchange for MAPs.

283.    Since at least September 11, 2017, whenever Defendants Aetna, UnitedHealthcare, Humana, and Blue KC paid "commissions" to MMA or Carefree USA those "commissions" constituted a kickback in violation of 42 U.S.C. § 1320a-7b(b) (the "Anti-Kickback Statute).

284.    Rather than comply with CMS's regulations concerning the sale and marketing of MAPs, Defendants Aetna, UnitedHealthcare, Humana, and Blue KC instead turned a blind eye to MMA's illegal activity so as to profit from the MAPs that it was able to generate through wanton violation of the law despite Defendants' knowledge of its responsibilities under the "Part C Application Certification."

285.    Defendants Aetna, UnitedHealthcare, Humana, and Blue KC knowingly and willfully allowed the payment of commissions to MMA to which it was not entitled, knowing that MMA was in violation of CMS regulations governing the sale and marketing of MAPs.

**MMA causes false claims to be submitted to the government for Medicare Advantage commissions relating to enrollment of ineligible individuals in "Extra Help"**

286.    MMA also causes false claims to be submitted to the government by manipulating Medicare's "Extra Help" program.

287.    "Extra Help" is a federally funded program to subsidize Medicare prescription drug coverage for lower income individuals—separate from Medicaid.

64

288.     The period between January and September is known as Special Enrollment Period or "SEP."  During SEP, only certain Medicare beneficiaries can be enrolled in MAPs, including those who qualify for Extra Help.

289.     To qualify for Extra Help in 2018, a number of criteria must have been met.  An individual's resources must be limited to $14,100 and $28,150 is the limit for a married couple living together.[14]  Annual income must be no more than $18,210 for an individual and $24,690 for a married couple living together.[15]

290.     In addition to MAPs, MA organizations offer Extra Help coverage enrollment.[16] Like with MAPs, MMA agents offer assistance to beneficiaries who might want to enroll in Extra Help.

291.     In order to qualify for Extra Help, an individual or couple must apply through the Social Security Administration which evaluates resources and income to determine eligibility.[17] The Social Security Administration sends a letter verifying eligibility after their determination.

292.     When meeting with potential enrollees during SEP, an agent is supposed to ask for the letter from the Social Security Administration before assisting an individual or couple in the application process.

293.     MMA tells its agents to sign people up for Aetna Coventry's plans using Extra Help as the SEP qualifier and without verifying eligibility because "Coventry never checks [the

---

[14] https://www.ssa.gov/pubs/EN-05-10525.pdf
[15] *Id.*
[16] *See, e.g.,* https://www.coventry-medicare.com/en/prescription-drugs/extra-help-pay-medicare-prescriptions.html.
[17] https://www.ssa.gov/pubs/EN-05-10525.pdf.

65

income qualifications].” The applications are filled out, sent to Aetna, who sends them to CMS for official enrollment.

294.    MMA pushes it agents to enroll individuals in Extra Help without regard to eligibility because such individuals are then eligible for other enrollments or changes to their enrollment in MAPs. Enrollment in Extra Help allows agents to enroll individuals in MAPs during SEP and/or 12-months a year.

295.    Each such application for enrollment is, like those obtained during AEP, turned in to MMA. MMA, knowing that the applicant does not qualify to enroll during SEP, then submits it and CMS approves the payment of commissions to MMA.

296.    Such commissions—those obtained from MAP enrollments that follow the improper enrollment of individuals in Extra Help—should never issue and would never have issued if the government knew that they were submitted as a result of this fraudulent scheme.

297.    As an example of how MMA operates this scheme, there is a couple in Excelsior Springs, Missouri, that MMA agent Hedenkamp helped enroll in a Coventry MAP during AEP 2017. Hedenkamp had carefully discussed the couple’s lifestyle and needs and the couple decided that a PPO MAP would be most suitable. In February 2017, Hedenkamp went into an online system Coventry makes available to agents that sell its MAPs.  That system indicated an issue with the Excelsior Springs couple. Hedenkamp called them and learned that MMA had visited them and advised them to switch to an HMO MAP—which MMA accomplished during SEP by asserting in the application that the couple was eligible for Extra Help. The couple’s income does not qualify them for Extra Help, but MMA simply checked the box and banked on the fact that no one would check that MMA had properly evaluated whether the couple was

66

income-qualified. As a result, MMA submitted an application for a new MAP and obtained the commission associated with that enrollment.

298.    By engaging in this enrollment fraud, MMA was able to obtain commissions that, absent this fraud, it would not have been entitled to.

**MMA causes false claims to be submitted to the government for Medicare Advantage commissions relating to enrollment of ineligible individuals <u>following the completion of the MORx program</u>**

299.    Some states offer a state pharmaceutical assistance program ("SPAP") to help their residents pay for prescription drugs.  Some SPAPs relate to specific illnesses (like HIV/AIDS or end-stage renal disease) and some cover Medicare beneficiaries generally.[18]

300.    Missouri had an SPAP from 2014 through June 30, 2017, called MORx, which was offered to Medicare beneficiaries at or below a particular income level.  The MORx income limitations were higher than those making beneficiaries eligible for Extra Help.  In other words, Missouri residents on Medicare whose income was too high for Extra Help, might still qualify for MORx.

301.    MORx worked with all Medicare Part D plans and paid for 50% of the beneficiary's out-of-pocket costs on medications covered by that beneficiary's Part D plan.[19]

302.    Medicare anticipated that Missouri Medicare beneficiaries who were participating in MORx might want to make changes to their Medicare plans at the expiration of MORx. As a result, Medicare allowed changes to Missouri MORx participants Medicare plan enrollment during the sixty days following the expiration of MORx—during SEP, 2017.

---

[18] https://www.medicareinteractive.org/pdf/SPAP-Chart.pdf.
[19] https://dss.mo.gov/mhd/faq/pags/faqmo_rx.htm.

303.     MMA took advantage of these circumstances in July, August, and September, 2017, by advising its agents to use the expiration of MORx to change Missouri residents' MAPs. MMA told its agents to indicate on the applications that the residents were MORx participants without regard to whether that was true and in most cases it was not.

304.     MMA advised its agents to market MAPs during SEP, 2017 (specifically July, August, and September) and to indicate on Coventry applications that the applicants were losing MORx, and were therefore eligible for changes to their Medicare coverage during SEP based on the required income qualifications—which MMA never intended to and never did check or confirm.

305.     MMA obtained commissions from CMS based on these falsified applications, or applications submitted with reckless disregard for their accuracy. If the applicants were not actually losing MORx, they were not eligible to change their MAPs during SEP and MMA could not have obtained commissions based upon those applications.

306.     By engaging in this enrollment fraud, MMA was able to obtain commissions that, absent this fraud, it would not have been entitled to.

**Defendant MA organizations are coordinating a fraud on the Medicare Star Ratings system to obtain higher funding for their Medicare Advantage plans and receive <u>Quality Bonus Payments they are</u> <u>not entitled to receive</u>**

307.     CMS uses a five-star quality rating system ("Star Rating system") to measure Medicare beneficiaries' experience with their health plans and the health care system. It also applies to Medicare Advantage plans that cover both health services and prescription drugs.

68

308.    According to the CMS's Medicare 2018 Part C & D Star Ratings Technical Notes, the data used in the Star Ratings comes from Health and Drug Plans, Data Collected by CMS Contractors, Surveys of Enrollees and CMS Administrative Data:



The data used in the Star Ratings come from four categories of data sources which are shown in Figure 2.
Figure 2: The Four Categories of Data Sources

309.    Importantly, any information that brokerages like MMA receive are not used by CMS in determining a plan's Star Rating.

310.    The overall Star Rating gives a rating of the plan's quality and performance that includes member experience with the health plan, member complaints with the health plan's performance, health plan customer service, and customer satisfaction.

311.    Higher star ratings have concrete financial benefits, including annual Quality Bonus Payments paid by CMS to MA plans.

312.    Star Ratings are based on a 5 Star scale. For example, a 1 Star Rating would be considered poor whereas a 5 Star Plan would be considered highly rated.

313.    Plans with 4 or 5 Star Ratings receive money from CMS totaling 5% of the value of the capitated payment averaging $500 per beneficiary.

69

314.    Plans with a 4 or 5 Star Rating receive the highest Quality Bonus Payments. Plans with Star Ratings below 3 are ineligible for Quality Bonus Payments.

315.    To illustrate, CMS's 2018 Report Card shows that Aetna Coventry Missouri's "Star Ratings" related to customer satisfaction are:

- 4 Stars – Experience with the health plan
- 5 Stars – Member complains and changes in health plan performance
- 5 Stars – Health plan customer Service

316.    Aetna Coventry offers three plans in the Kansas City area: "Advantra Advantage," "Advantra Freedom," and "Freedom Plus." The overall rating of the "Advantra Advantage" plan is 4 Stars. "Advantra Freedom" and "Freedom Plus" plans have 3.5 Star ratings.

317.    Blue KC's MAP received 3.5 Stars.

318.    All of Humana's Kansas City based MAPs are either too new to have a Star Rating or have a 3.5 Star or 4 Star Rating.

319.    All of UnitedHealthcare's Kansas City-based MAPs have either a 3.5 Star or 4 Star Rating.

320.    Certain urban counties with both low fee-for-service spending and historically high Medicare Advantage enrollment are designated "double-bonus counties." The Quality Bonus Payments applied in these counties are twice as high as other counties.

321.    In "double-bonus" counties in Missouri the Quality Bonus Payment is 10%, not 5%, averaging $1000 per beneficiary. "Double-bonus" counties in Missouri include, but are not limited to, Cass and Jackson counties.

70

322.    Of the importance in getting the 4 Star rating for its plans, Michael Kavouras, Vice President of Star Ratings at Aetna, stated:  "**Getting to 4 stars is really, really critical**." (Emphasis supplied.)

323.    To assist in the evaluation process to obtain Star Ratings, CMS requires all MA organizations to utilize CMS' "Complaint Tracking Module" ("CTM") that enables both MA organizations and CMS to track the number and types of complaints they receive about MAPs.

324.    In a June 8, 2012 memorandum addressed to "Medicare Compliance Officers, Part C& D Sponsors," CMS stated that "(a)ll Sponsors should understand that correct utilization of CTM is *critical to ensuring the accuracy of complaint information and plan's responses to these complaints*." (Emphasis supplied.)

325.    Results from the CTM are used by CMS in determining a plan's Star Rating.

326.    MMA/Carefree has instituted a system designed to bypass the CTM system.

327.    MMA sales materials include stickers directing Medicare beneficiaries to call MMA—and not the MA organization or CMS—with any problems with the beneficiary's insurance.

328.    Furthermore, MMA directs its agents to encourage beneficiaries to call the agent whenever there is a problem with their MAPs:

11. Stress <u>repeatedly</u> that you are there for them and that they should **ALWAYS CALL YOU** if they have any questions or concerns.

329.    For example, each time MMA sells a MAP to a beneficiary the beneficiary receives this refrigerator magnet:

71



330.    Any "questions, concerns or problems" a beneficiary has with his or her Medicare

Advantage plan should be addressed to the carrier or CMS not steered to the insurance brokerage

who sold the plan.

331.    This scheme directly impacts the Star Rating system because it discourages, if not

completely eliminates, the reporting of "member complaints" to the CTM system and, in turn, to

CMS for use in the calculation of a plan's Star Ratings.

332.    The scheme to use this "sticker" is but a cleverly veiled attempt by the Defendant

MA organizations to ensure that all of the complaints related to their plans sold by MMA never

reach CMS and thus are not calculated into the Star Ratings of Defendant MA organization's plans.

333. This, in turn, helps the MA organizations both retain their plans' Star Ratings and thus enable them to continue to receive Quality Bonus Payments in the case of plans with Star Ratings of 4 or higher.

334. MAPs with higher Star Ratings also receive higher rebate percentages on their contracts with CMS, resulting in higher rebates from CMS and increased payments from the federal government.

335. Consequently, without the illicitly inflated Star Ratings for their plans, the Defendant MA Organizations would not have received higher rebate percentages on their contracts with CMS resulting in higher rebates from CMS and increased payments from the federal government.

336. As MMA have locations throughout the United States this fraud on the CMS's Star Ratings system is not limited to the Kansas City area.

337. In light of this scheme, any Quality Bonus Payments that Defendant MA organizations received or will receive were predicated on a fraud on CMS because the MA organizations acted in concert with MMA to limit, and possibly eliminate, the number of complaints registered with the CTM system.

338. The Government, unaware of the scheme to divert complaints about Defendant MA organizations' plans was defrauded by the Defendant MA organizations in the calculations of the Star Ratings for their plans.

73

339.    This fraud caused the Government to pay Quality Bonus Payments to the

Defendant MA organizations that they were not entitled to.

**CAUSES OF ACTION**
**COUNT I**

**FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. §3729(a)(1)[1986] and 31 U.S.C. §3729(a)(1)(A)[2009]**
**AGAINST DEFENDANT MMA**

340.    Relator repeats and re-alleges each allegation contained in the preceding

paragraphs as though fully set forth herein.

341.    MMA knowingly presented or caused to be presented applications for enrollment

in MAPs.

342.    MMA knowingly presented or caused to be presented these applications for

enrollment in MAPs that were obtained from its agents who were not properly Medicare

Advantage-certified.

343.    MMA knowingly presented or caused to be presented these applications for

enrollment in MAPs that were obtained from its agents who were not properly carrier-certified.

344.    MMA knew that its agents were not properly CMS or carrier- certified.

345.    Each time MMA presented or caused to be presented an application for

enrollment in a MAP, CMS approved the payment of a commission to MMA in accordance with

the published rates for that year and MAP.

346.    Compliance with CMS-mandated annual certifications—both Medicare

Advantage and carrier-specific—is a condition of payment of commissions ("Plan sponsor

should pay compensation *so long as the agent is in good standing*."). (Emphasis supplied.)

74

347. If CMS knew that MMA agents were not properly certified and thus not in "good standing," it would not approve payments of commissions to MMA.

348. MMA knowingly and/or recklessly submitted MAP applications that resulted from its agents who it knew were not properly certified to obtain CMS commissions.

349. As described *infra*, MMA knowingly and/or recklessly directed its agents to violate CMS regulations while their agents were selling MAPs to vulnerable Medicare beneficiaries.

350. As a result of this wanton disregard of CMS regulations, MMA agents obtained signed MAP applications that, in turn, MMA caused to be submitted to CMS for verification and payment of commissions.

351. If CMS had known that signed MAP applications were obtained as a result of violation of CMS regulations, CMS would never have authorized payment of commissions for those applications.

352. Through these acts, Defendant MMA knowingly and/or with reckless disregard for the truth presented or caused to be presented false or fraudulent claims to the United States under Medicare in violation of 31 U.S.C. §3729(a)(1)[1986] and 31 U.S.C. §3729(a)(1)(A)[2009].

353. By virtue of the false or fraudulent claims that Defendant MMA presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

75

## COUNT II

**FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. §3729(a)(1)[1986] and 31 U.S.C. §3729(a)(1)(A)[2009]**
**AGAINST DEFENDANT CAREFREE INSURANCE SERVICES, INC.**

354.     Relator repeats and re-alleges each allegation contained in the preceding paragraphs as though fully set forth herein.

355.     Carefree Insurance knew that MMA engaged in illegal sales and marketing tactics in its sale of Medicare Advantage plans.

356.     Carefree Insurance knew that MMA engaged in sales agent certification fraud practices.

357.     Nevertheless, Carefree Insurance funded MMA's expansion to benefit from MMA's illegal sales and marketing tactics and sales certification practices.

358.     Furthermore, Carefree Insurance paid MMA bonuses for MAPs.

359.     Lastly, Carefree Insurance and MMA entered into an agreement wherein Carefree funded MMA's expansion and paid bonuses to MMA in exchange for MMA agents "push(ing)" Aetna plans.

360.     Consequently, Carefree Insurance's payments to MMA for MAPs that were sold because of violations of federal law constituted kickbacks in violation of 42 U.S.C. § 1320a-7b(b) (the "Anti-Kickback Statute).

361.     The Anti-Kickback Statute prohibits parties who participate in federal health care programs from knowingly and willfully offering, paying or receiving any remuneration in order to induce the recommendation of any item for which payment is made in who or in part under a covered federal health care program.

76

362.     Any payment as result of Carefree Insurance and MMA's agreement wherein MMA agents would "push" Aetna Medicare Advantage plans in exchange for "money" constituted a kickback.

363.     Through these acts, Defendants Carefree Insurance knowingly and/or with reckless disregard for the truth presented or caused to be presented false or fraudulent claims to the United States under Medicare in violation of 31 U.S.C. §3729(a)(1)[1986] and 31 U.S.C. §3729(a)(1)(A)[2009].

364.     By virtue of the false or fraudulent claims that Defendants presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

**COUNT III**

**FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. §3729(a)(1)[1986] and 31 U.S.C. §3729(a)(1)(A)[2009]**
**AGAINST AETNA, UNITEDHEALTHCARE, HUMANA AND BLUE KC**

365.     Relator repeats and re-alleges each allegation contained in the preceding paragraphs as though fully set forth herein.

366.     As of September 11, 2017, if not sooner, Defendants Aetna, UnitedHealthcare, Humana, and Blue KC were informed that MMA was in violation of laws and CMS regulations governing the sale and marketing of Medicare Advantage plans.

367.     Defendants Aetna, UnitedHealthcare, Humana, and Blue KC were, and are, responsible under CMS regulations to ensure agents/brokers "abide by all applicable state and federal laws, regulations and requirements."

368.     Rather than cease accepting MAPs from MMA, Defendants Aetna, UnitedHealthcare, Humana, and Blue KC continue to do so despite the fact that these MAPs

77

were obtained as a result of MMA not abiding by "all applicable state and federal laws, regulations, and requirements."

369. Consequently, since September 11, 2017, whenever Defendants Aetna, UnitedHealthcare, Humana, and Blue KC paid commissions to MMA or Carefree USA that commission constituted a kickback in violation of 42 U.S.C. § 1320a-7b(b) (the "Anti-Kickback Statute).

370. Despite this knowledge, and even though the law and CMS regulations require Defendant plan sponsors like Aetna, UnitedHealthcare, Humana, and Blue KC ensure that that its plans are marketed and sold in compliance with the law and CMS regulations, Aetna, UnitedHealthcare, Humana, and Blue KC nevertheless accepted Medicare Advantage applications from MMA and Carefree USA they knew were obtained as a result of violations of the law and CMS regulations.

371. In its Certification to CMS, all Defendant MA organizations falsely certified that they would adhere to "all marketing requirements in 422.2260 through 422.2276 of the Medicare Marketing Guidelines."

372. After their receipt of these fraudulently obtained applications, Defendants knowingly presented or caused to be presented applications for enrollment in MAPs and, in doing so, illicitly profited from these enrollments.

373. Since at least September 11, 2017, Defendants have paid MMA and Carefree USA kickbacks in exchange for MAPs.

374.     Through these acts, the Defendants knowingly and/or with reckless disregard for the truth presented or caused to be presented false or fraudulent claims to the United States under Medicare in violation of 31 U.S.C. §3729(a)(1)[1986] and 31 U.S.C. §3729(a)(1)(A)[2009].

375.     If CMS had known that signed MAP applications were obtained as a result of violation of applicable state and federal laws, regulations and requirements, CMS would never have verified the enrollment of these beneficiaries into Medicare Advantage program.

376.     By virtue of the false or fraudulent claims that Defendant presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT IV

**FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. §3729(a)(1)[1986] and 31 U.S.C. §3729(a)(1)(A)[2009]**
**AGAINST DEFENDANT MMA**

377.     Relator repeats and re-alleges each allegation contained in the preceding paragraphs as though fully set forth herein.

378.     MMA knowingly presented or caused to be presented applications for enrollment in MAPs indicating the applicants were eligible for Extra Help, when MMA knew such applicants were not qualified.

379.     These applications were submitted outside of AEP, which would not have been permitted absent the indication that the applicants were eligible for Extra Help.

380.     MMA instructed its agents to enroll people in Extra Help without checking and without regard to whether such clients were income-qualified.

381.     MMA then instructed its agents enroll such clients in MAPs, outside of AEP.

79

382. MMA knew that such MAP applications are not permitted outside of AEP for unqualified individuals.

383. Each time MMA presented or caused to be presented an application for enrollment a MAP during SEP, with the indication that the applicant was eligible for Extra Help, CMS approved the payment of a commission to MMA in accordance with the published rates for that year.

384. The payment of commissions is conditioned upon compliance with the income limitations for Extra Help and MAPs outside of AEP.

385. CMS would not approve payment of commission to MMA for applications for enrollment of unqualified individuals.

386. MMA knowingly and/or recklessly submitted MAP applications for individuals that were not qualified for Extra Help during SEP in order to obtain CMS commissions.

387. Through these acts, MMA knowingly and/or with reckless disregard for the truth presented or caused to be presented false or fraudulent claims to the United States under Medicare in violation of 31 U.S.C. §3729(a)(1)[1986] and 31 U.S.C. §3729(a)(1)(A)[2009].

388. By virtue of the false or fraudulent claims that Defendant presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

## COUNT V

**FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. §3729(a)(1)[1986] and 31 U.S.C. §3729(a)(1)(A)[2009]**
**AGAINST DEFENDANT MMA**

389. Relator repeats and re-alleges each allegation contained in the preceding paragraphs as though fully set forth herein.

80

390.     MMA knowingly presented or caused to be presented applications for enrollment in MAPs during an SEP in July, August, and September 2017, indicating that applicants were losing their MORx benefits because the program was ending.

391.     MMA knew such applicants were not income-qualified for changes to their MAPs during this SEP and they were not on MORx when the program ended June 30, 2017.

392.     These applications were submitted outside of AEP, which would not have been permitted absent the indication that the applicants were losing MORx.

393.     MMA instructed its agents to indicate the applicants were losing MORx without checking and without regard to whether they were income-qualified.

394.     MMA then instructed its agents enroll such clients in MAPs, outside of AEP.

395.     MMA knew that such MAP applications are not permitted outside of AEP for unqualified individuals.

396.     Each time MMA presented or caused to be presented an application for enrollment a MAP during SEP, with the indication that the applicant was losing MORx, CMS approved the payment of a commission to MMA in accordance with the published rates for that year.

397.     The payment of commissions was conditioned upon compliance with the income limitations for applications outside of AEP.

398.     CMS would not approve payment of commission to MMA for applications for enrollment of unqualified individuals.

399.     MMA knowingly and/or recklessly submitted MAP applications for individuals that were not losing MORx during SEP in order to obtain CMS commissions.

81

400.     Through these acts, MMA knowingly and/or with reckless disregard for the truth

presented or caused to be presented false or fraudulent claims to the United States under

Medicare in violation of 31 U.S.C. §3729(a)(1)[1986] and 31 U.S.C. §3729(a)(1)(A)[2009].

401.     By virtue of the false or fraudulent claims that Defendant presented, the United

States has suffered actual damages and is entitled to recover treble damages and a civil penalty

for each false claim.

### COUNT VI

**FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. §3729(a)(1)[1986] and31 U.S.C. §3729(a)(1)(A)[2009]**
**AGAINST AETNA, UNITEDHEALTHCARE, HUMANA, AND BLUE KC**

402.     Relator repeats and re-alleges each allegation contained in the preceding

paragraphs as though fully set forth herein.

403.     Defendant MA organizations are engaging in a fraudulent scheme to limit the

number of complaints that are registered for its Medicare Advantage plans.

404.     Defendants Aetna, UnitedHealthcare, Humana, and Blue KC are responsible

under CMS regulations to ensure agents/brokers (like MMA) to "abide by all applicable state and

federal laws, regulations and requirements."

405.     MMA directs Medicare beneficiaries to which it sells MAPs to contact MMA—

and not CMS or the Defendant MA organizations—with any complaints about the Defendant

MA organizations' plans.

406.     CMS requires that all customer complaints related to Medicare Advantage Plans

be tracked by the Complaint Tracking Module ("CTM") that allows CMS to track: (1) the

82

number of complaints a particular plan has and (2) how the MA organization resolves such complaints.

407.    The CTM is used by CMS to track customer satisfaction with a Medicare Advantage Plan. Scores derived from the CTM are used in determining the Star Rating for the Medicare Advantage Plan.

408.    Defendant MA organizations have illicitly received Quality Bonus Payments for their Medicare Advantage based on their plans' Star Ratings that were inflated as a result of Defendants illicit scheme.

409.    Quality Bonus Payments are funded by federal dollars.

410.    The Government would not have paid these Quality Bonus Payments but for Defendants' illegal conduct.

411.    MAPs with higher Star Ratings also receive higher rebate percentages on their contracts with CMS, resulting in higher rebates from CMS and increased payments from the federal government.

412.    Consequently, without the inflated Star Ratings, the Defendant MA Organizations would not have received higher rebates percentages on their contracts with CMS resulting in higher rebates from CMS and increased payments from the federal government.

413.    By virtue of the false or fraudulent claims that Defendants presented, the United States has suffered actual damages and is entitled to recover treble damages and a civil penalty for each false claim.

WHEREFORE, Relator, on behalf of the United States, demands that judgment be entered in their favor and against Defendants for the maximum amount of damages, penalties,

83

and such other relief as the Court may deem appropriate for each Count. This includes, with respect to claims under the Federal False Claims Act, three times the amount of damages to the Federal Government plus civil penalties of no more than Ten Thousand Dollars ($10,000.00) and no less than Five Thousand Dollars ($5,000.00), adjusted for inflation, for each false claim, and any other recoveries or relief provided for under the Federal False Claims Act.

Further, Relator requests that she receives the maximum amount permitted by law of the proceeds of this action or settlement of this action collected by the United States plus reasonable expenses necessarily incurred, and reasonable attorneys' fees and costs. Relator requests that her award be based upon the total value recovered, both tangible and intangible, including any amounts received from individuals or entities not parties to this action.

## DEMAND FOR JURY TRIAL

A jury trial is demanded in this case.

Dated:  October 1, 2021                           Respectfully submitted,

                                                  /s/ *Tyler W. Hudson*
                                                  Tyler W. Hudson, MO Bar #53585
                                                  Wagstaff & Cartmell LLP
                                                  4740 Grand Avenue, Suite 300
                                                  Kansas City, MO  64112
                                                  Tel (816) 701-1100
                                                  Fax (816) 531-2372
                                                  thudson@wcllp.com

                                                  Kenneth A. Wexler
                                                  Kara A. Elgersma
                                                  Wexler Wallace, LLP
                                                  55 West Monroe, Suite 3300
                                                  Chicago, Illinois  60603
                                                  (312) 346-2222
                                                  kaw@wexlerwallace.com
                                                  kae@wexlerwallace.com

84

James J. Pepper
The Pepper Law Firm, LLC
68 E. Court Street, Suite 2A
Doylestown, Pennsylvania 18901
(215) 340-2500
pepper@jamespepperlaw.com

*Counsel for Plaintiff-Relator Elizabeth D. Holt*