IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. ELIZABETH D. HOLT, )<br>)<br>Relator, )<br>v. )<br>)<br>MEDICARE MEDICAID ADVISORS, INC., )<br>*et al.*, )<br>)<br>Defendants. ) | Case No. 18-cv-00860-DGK |

## ORDER GRANTING MOTIONS TO DISMISS

This is a *qui tam* action brought by Relator Elizabeth Holt ("Relator"), a former employee of Defendant Medicare Medicaid Advisors, Inc. ("MMA"), an insurance brokerage. MMA is at the heart of the allegations in this case. Relator alleges it violated the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1),[1] in fraudulently certifying its insurance agents who marketed Medicare Advantage plans as well as in how it marketed those plans to seniors.[2] Relator contends that as a result, the United States paid tens of millions of dollars in fraudulent commission payments to MMA that is otherwise would not have paid. Relator alleges the defendant insurance carriers in this case are liable under the FCA because they failed to oversee MMA's actions and ensure the proper marketing and sale of their Medicare Advantage plans.

---

[1] Strictly speaking, the Complaint alleges violations 31 U.S.C. § 3729(a)(1) (West 1986) and 31 U.S.C. § 729(a)(1)(A) (West 2009), the statutes in effect before and after 2009. For purposes of this lawsuit, the statutes are identical. The former states, "Any person who knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval" shall be liable. The 2009 amendment removed the "or a member of the Armed Forces of the United States" language. Throughout this order, the Court will cite the 2009 statute.

[2] At times, Relator references the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), but all six counts in the Second Amended Complaint are brought under the FCA.

Now before the Court are Defendants' various motions to dismiss. ECF Nos. 67, 69, 74, and 76. Because the Complaint fails to sufficiently allege a false claim was presented to the Government for payment, or that any false statements made were material to the Government's decision to make such payments, or to plead the Complaint's allegations with the requisite particularity, the motions are GRANTED. And because amendment would be futile, all claims are dismissed with prejudice.

## Standard of Review

A complaint may be dismissed if it fails "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To avoid dismissal, the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although it need not make detailed factual allegations, it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Benton v. Merrill Lynch & Co.*, 524 F.3d 866, 870 (8th Cir. 2008).

The complaint must also state a claim for relief that is plausible. *Iqbal*, 556 U.S. at 678. A claim is plausible when "the court may draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The plaintiff need not demonstrate the claim is probable, only that it is more than just possible. *Id*. In reviewing the complaint, the court accepts as true its factual allegations and draws all reasonable inferences in the plaintiff's favor. *Drobnak v. Andersen Corp.*, 561 F.3d 778, 781 (8th Cir. 2009).

Additionally, "[b]ecause the FCA is an anti-fraud statute, complaints alleging violations of the FCA" must be pled with particularity pursuant to Rule 9(b). *Id.* at 783. Conclusory allegations that the defendant's conduct was fraudulent and deceptive are insufficient. *Id.* "[T]he complaint must plead the who, what, where, when, and how of the alleged fraud." *Id.* Where the relator claims systemic fraud, he or she need not "allege specific details of every alleged fraud claim,"

but "must provide some representative examples of [the] alleged fraudulent conduct, specifying the time, place, and content of [the] acts and the identity of the actors." *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 557 (8th Cir. 2006) (emphasis in original).

### Factual and Regulatory[3] Background

There are multiple components of the Medicare program. Under Medicare Parts A and B, "the Centers for Medicare and Medicaid Services ('CMS') within the Department of Health and Human Services pays for medical care that eligible individuals receive from participating providers." *United States ex rel. Gray v. UnitedHealthcare Ins. Co.*, No. 15-cv-7137, 2018 WL 2933674, at *2 (N.D. Ill. June 12, 2018). CMS "sets rates for the care and reimburses providers for each service provided," which is why Parts A and B are sometimes called Medicare "fee-for-service." *Id.* This case involves a different program: Medicare "Part C," the Medicare Advantage program that allows eligible beneficiaries to receive Medicare benefits through private insurers such as the insurance carrier defendants in this case. *See* 42 U.S.C. § 1395w-21.

To understand the allegations in this case, it is necessary to understand how insurance carriers and insurance brokers are paid under Medicare "Part C," as well as how Medicare Advantage Star Ratings work. This is explained below, along with a summary of the Complaint's allegations.

### I. The Medicare Advantage Program, Sales Commissions, and Enforcement Provisions

In the Medicare Advantage program, participating insurers receive a monthly sum for each beneficiary enrolled; this number is usually referred to as the per-member-per-month amount. *Id.* § 1395w-23(a)(1). "Unlike traditional Medicare, CMS does not pay for every service provided through Medicare Advantage. Rather, it pays Medicare Advantage plans a set, monthly payment

---

[3] The Court's summary of the regulatory background draws heavily from the "Medicare Advantage Program and Sales Commissions" section of Defendant UnitedHealthcare Insurance Company's initial brief. ECF No.75 at 2-5.

regardless of the number of" services the enrollee uses or the plan provides. *Gray*, 2018 WL 2933674, at *7. The fixed monthly payment is determined based on bids that Medicare Advantage organizations ("MAOs"), such as insurance carriers, submit well before annual plan enrollment occurs. *See* 42 U.S.C. § 1395w-23(a)(1)(B). Each bid "must contain all estimated revenue required by the plan, including administrative costs and return on investment." 42 C.F.R. § 422.254(b)(3). Insurers therefore estimate "non-benefit expenses," which includes commissions and other administrative, non-medical spend, as part of the bid.[4] CMS's payment to an MAO is not affected by the Medicare Advantage plan's actual costs, either benefit or non-benefit. *Cf. Rasmussen v. Essence Grp. Holdings Corp.*, No. 17-cv-3273-S-BP, 2020 WL 4381771, at *2 (W.D. Mo. Apr. 29, 2020).

Under the regulations, an MAO may use independent agents to sell its plans. 42 C.F.R. § 422.2274. And MAOs may pay commissions to those agents. Each year CMS publishes the approved commission limits on its website in accordance with the federal regulations. *Id*. (setting the "amount that CMS determines could reasonably be expected to be paid for an enrollment or continued enrollment into an MA plan"). When an insurance brokerage such as MMA sends a Medicare Advantage enrollment application to a participating insurer, the insurer—not CMS— pays the commission, if any, according to the brokerage's contracted rate with that entity. *See, e.g., id*. at § 422.2274(d)(1). Because MAOs receive "a fixed monthly payment regardless of the volume of services an enrollee uses," *Gray*, 2018 WL 2933674, at *2, no one submits any "claim" to CMS for an individual Medicare Advantage commission. While regulations set commission limits, require agents to be licensed, appointed, and trained, and discuss MAO oversight, those regulations do not require or provide that CMS approve specific commission payments a plan

---

[4] *See, e.g.*, Instructions for Completing the Medicare Advantage Bid Pricing Tools, https://www.hhs.gov/guidance/sites/default/files/hhs-guidance- documents/2012215122-op-cy2016_ma_bpt_instructions.pdf.

4

makes to an agent or broker. *See* 42 C.F.R. § 422.2274(b) (listing agent requirements); *id*. at § 422.2274(c) (listing oversight requirements for MAOs). Rather, the regulations provide that "[Medicare Advantage] organizations may determine, through their contracts, the amount of compensation to be paid, provided it does not exceed limitations outlined" in CMS's rules. 42 C.F.R. § 422.2274(d)(1)(ii).

Thus, just as additional services do not result in increased payment from CMS to MAOs, whether an MAO pays a sales commission to a downstream broker does not impact the monthly payment that CMS pays an MAO. *Cf. Gray*, 2018 WL 2933674, at *7.

Finally, CMS has "intermediate sanctions" to address MAOs which are out of compliance with Medicare Advantage regulations, including the Medicare marketing regulations. *See* 42 C.F.R. § 422.752(a)(11). CMS's administrative process for addressing regulatory non-compliance includes suspending future plan enrollment, suspending payment for beneficiaries who are enrolled after CMS has notified the organization of the intermediate sanction, suspending communications (including marketing activity), and imposing monetary penalties. *Id*. at § 422.750.

## II. Medicare Advantage Star Ratings

Medicare Advantage plans receive Star Ratings from 1 star (lowest) to 5 stars (highest). Star Ratings serve multiple purposes, to: "provide beneficiaries information on plan performance to consider when choosing a plan," "assist CMS in identifying low performing plans for compliance actions," and serve as factors in the Quality Bonus Payment program. *AvMed, Inc. v. Becerra*, No. 20-cv-3385 (JDB), 2021 WL 2209406, at *3 (D.D.C. June 1, 2021). Medicare Advantage plan Star Ratings derive from numerous factors and data sources:

> Part C Star Ratings measures reflect structure, process, and outcome
> indices of quality. This includes information of the following types:

5

Case 4:18-cv-00860-DGK   Document 101   Filed 08/22/22   Page 5 of 17

> Clinical data, beneficiary experiences, changes in physical and mental health, benefit administration information and CMS administrative data.

42 C.F.R. § 422.162(c)(1). A plan's overall Star Rating "reflects the weighted mean of the measure-level ratings, plus applicable adjustments." *AvMed, Inc.*, 2021 WL 2209406, at *3 (citing 42 C.F.R. § 422.162(b)(1)).

### III. The Complaint's Allegations

The allegations in the Second Amended Complaint ("the Complaint"), ECF No. 27, can be summarized as follows.

MMA is an insurance brokerage that operates a network of sales agents who market and sell Medicare Advantage Plans to residents of Missouri, Kansas, Nebraska, Iowa, Illinois, Arkansas, and Oklahoma. Defendant Medicare Medicaid Advisors USA, Inc. is "a sister company" of MMA that markets and sells Medicare Advantage plans to residents in Texas, Louisiana, Mississippi, Tennessee, Alabama, Georgia, and Florida. Its original name was Carefree Solutions USA, Inc.; it changed its name to Medicare Medicaid Advisors USA, Inc. in 2019. It shares the same direct management with MMA and same website. When the Complaint refers to MMA, it is also referring to Medicare Medicaid Advisors USA, Inc.

Beginning with MMA's inception in 2006 through some time after Relator's employment ended, MMA engaged in a systematic, company-directed fraud based on the falsification of government-mandated agent certifications and widespread violations of CMS regulations regarding the marketing of Medicare Advantage plans.

MMA's misconduct can be grouped into three primary schemes:[5]

---

[5] Count II alleges a fourth scheme involving just Defendant Carefree Insurance Services, Inc., a subsidiary of Aetna.

1. **The Agent Certification Scheme.** MMA engaged in a widespread Medicare Advantage sales agent certification fraud scheme—falsely attesting its agents were fully certified to sell Medicare Advantage plans when MMA knew they were not—the sole purpose of which was to illegally obtain sales commissions from the Medicare Advantage program. Consequently, all of the Medicare Advantage plans submitted by MMA agents were false claims for payments of commissions.

2. **The Marketing Scheme.** MMA's sales of Medicare Advantage plans and related commissions resulted from violations of CMS sales and marketing regulations by MMA agents, and CMS would not have paid the commissions if it had known of the violations. The alleged unlawful business practices comprise: (i) cold-calling and door-to-door sales of Medicare Advantage plans when Medicare regulations only permit the marketing of a Medicare Advantage plan to someone who expresses an interest in learning about the plan; (ii) using false "lead" sheets to prompt or justify a sales call; (iii) making misrepresentations to beneficiaries; (iv) using the "White Pages" mobile application to find Medicare-aged individuals in the same area of other leads; (v) "churning," or encouraging beneficiaries to switch plans to generate commissions; (vi) "pushing" beneficiaries to Medicare Advantage plans preferred by MMA rather than plans that serve the best interests of the beneficiary; (vii) enrolling beneficiaries outside of the Annual Enrollment Period; and (viii) enrolling individuals in the federally subsidized Extra Help program without checking and without regard to whether they met income limitations.

3. **The Star Ratings Scheme.** The Complaint also alleges that MMA has instituted a system designed to bypass the Complaint Tracking Module which enables both MA organizations and CMS to track the number and type of complaints they receive about Medicare Advantage plans, thereby improving the Star Rating of each Medicare Advantage plan, and entitle the MA

7

organizations to certain financial incentives, including Quality Bonus Payments and higher rebate percentages. The system consisted of the use of marketing materials, such as refrigerator magnets, and directives to encourage beneficiaries to call MMA—not the MA organizations or CMS—with any problems with the beneficiary's insurance. In this way, MMA could lower the number of complaints CMS received about the Medicare Advantage plans.

Defendants Aetna Inc. ("Aetna"), Humana Inc. ("Humana"), and UnitedHealthcare Insurance Company ("United") are insurance carriers (collectively "the Insurance Carriers") that sponsor Medicare Advantage plans marketed and sold by MMA. All of the Insurance Carriers sold their Medicare Advantage plans through MMA.

Defendant Carefree Insurance Services, Inc. ("Carefree Insurance") is a subsidiary of Aetna. It is a full-service field marketing organization that represents insurance companies who offer products to the Medicare and commercial markets in the United States, including Medicare Advantage Plans. It receives money from insurance carriers to assist brokerages, like MMA, to sell Medicare Advantage plans.

Relator was an insurance agent for MMA from September 2015 through December 2016 who marketed and sold Medicare Advantage plans. After Relator's departure from MMA in December 2016, she twice provided notice of MMA's alleged misconduct to the Insurance Carriers. On September 11, 2017, Relator sent a letter to the Insurance Carriers advising them of MMA's unlawful marketing practices (the "September 2017 Notice"). On February 20, 2018, she sent a second letter to the Insurance Carriers and the Missouri Department of Insurance outlining MMA's illegal conduct.[6]

---

[6] The Complaint notes that the departments of insurance in both Kansas and Missouri did not conduct "any investigation whatsoever" of her complaints.

The Complaint contains six counts, all alleging violations of the FCA, 31 U.S.C. § 729(a)(1)(A).

MMA is named in Counts I, IV, and V. Count I alleges MMA violated the FCA by engaging in the Agent Certification Scheme to obtain commissions. Count IV alleges MMA violated the FCA by enrolling unqualified individuals in the Extra Help program to obtain commissions. Count V alleges MMA violated the FCA by enrolling individuals in Medicare Advantage Plans during the Special Enrollment Period to obtain commissions by falsely indicating these individuals' benefits under Missouri's state pharmaceutical assistance program were expiring and therefore eligible for changes to their Medicare coverage.

Carefree Insurance is named in Count II only. Read in the light most favorable to Relator, Count II asserts two theories: (i) Carefree Insurance violated the FCA by funding MMA's expansion despite knowing that MMA was engaged in the Agent Certification Scheme and the Marketing Scheme; and (ii) Carefree Insurance and MMA entered into an agreement wherein it funded MMA's expansion and paid bonuses to MMA in exchange for MMA agents 'pushing' Aetna plans, which violates 42 CFR 422.2268 (e) and (j) and 423.2268 (e) and (j). These payments to MMA constitute kickbacks in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

The Insurance Carriers are named in Counts III and VI. The crux of the allegations against these Defendants is that as MAOs, they are responsible for the actions of outside sales agents and brokers, and they must oversee such downstream entities to ensure they abide by all applicable state and federal laws, regulations and requirements. More specifically, Count III alleges the Insurance Carriers violated the FCA by continuing to submit enrollment forms for Medicare Advantage plans sold by MMA and pay commissions to MMA for those plans despite knowing that MMA agents were engaging in the Agent Certification and Marketing Schemes. And because Relator advised the Insurance Carriers of MMA's misconduct via the September 2017 Notice,

every commission paid to MMA thereafter constituted a kickback in violation of the Anti-Kickback Statute. Count VI alleges they violated the FCA by continuing to submit enrollment forms for Medicare Advantage plans sold by MMA and pay commissions to MMA for those plans despite knowing that MMA agents were engaging in the Star Rating Scheme.

## Discussion

**I.  Each Count in the Complaint fails to allege presentment of a false *claim* for payment.**

Counts I, III, IV, V, and VI must be dismissed because they fail to adequately plead the presentment of a *claim* for payment by the *government*. The FCA imposes liability when someone "knowingly presents, or causes to be presented, a false or fraudulent claim for payment" to the federal government for "payment or approval." 31 U.S.C. § 3729(a)(1)(A). Because "the act of submitting a fraudulent claim to the government is the sine qua non of a False Claims Act violation," a failure to plead the presentment of a false claim must result in dismissal. *See United States ex rel. Benaissa v. Trinity Health*, 963 F.3d 733, 740 (8th Cir. 2020).

As explained in the "Factual and Regulatory Background" section of this order, under Medicare Advantage CMS pays the Insurance Carriers a fixed sum each month for each member enrolled regardless of the services provided to plan members. Just as CMS pays "Medicare Advantage plans a set, monthly payment regardless of the number of" services the enrollee uses or the plan provides, *Gray*, 2018 WL 2933674, at *7, CMS also pays the same monthly payment regardless of *how* a member enrolls, whether through an agent or by contacting the Insurance Carriers directly. Hence, the Complaint's allegations that MMA agents submitted applications to the Insurance Carriers, which were then sent to CMS for verification and payment of a commission to MMA, *see, e.g.*, SAC ¶ 217, overlooks the fact that the Insurance Carriers pay the commissions (if they pay any commissions at all), not the Government. *See, e.g.*, 42 C.F.R. § 422.2274(d)(1)(i). Because the Insurance Carriers receive a fixed monthly payment, the Complaint's characterization

10

of their submitting a new application to CMS as a "claim[] for payment of commissions" to CMS is inaccurate. *See* SAC ¶ 118. Hence, Counts I and III through VI, which are premised on the payment by the Government being the commissions MMA received *from the insurance companies* as payment for a claim that was submitted or caused to be submitted by MMA, fail to state a claim.

With respect to Count II, Relator's theory for the alleged presentation of a false claim for payment to the Government is even more elusive and convoluted. The second theory asserted in Count II alleges that Carefree Insurance, knowing MMA engaged in sales agent certification fraud and illegal marketing practices, entered into an agreement to fund MMA's expansion into certain markets and pay MMA bonuses in exchange for MMA agents "pushing" Aetna's Medicare Advantage plans. This arrangement constituted a kickback under the Anti-Kickback Statute ("AKS"). And, although not explained in the Complaint, this violation of the AKS is a violation of the FCA because Medicare claims were submitted to the Government which included items or services (namely, "pushing" Aetna's Medicare Advantage plans) resulting from the AKS violation. *See* Relator's Suggestions in Opp'n to Aetna/Carefree Insurance's Mot. to Dismiss at 7, ECF No. 83. But where is the claim to be paid by the Government here? As in the other Counts, Relator's answer appears to be the new application submitted to CMS. But, as discussed above, the Government did not pay commissions to MMA, the Insurance Carriers did, which is insufficient to establish presentment of a false claim for payment by the Government.

Since the inability to allege the false presentment of a clam for payment by the Government is inherent in Relator's theories of liability, it cannot be fixed with a revised pleading, and dismissal is with prejudice.

**II.     Counts I through VI also fail to allege Defendants made a *material* falsehood.**

To state a claim under § 3729(a)(1)(A), a relator must allege: (1) the defendant made a claim against the United States; (2) the claim was false or fraudulent; and (3) the defendant knew the claim

11

was false or fraudulent. *Olson v. Fairview Health Servs. of Minn.*, 831 F.3d 1063, 1070 (8th Cir. 2016). Additionally, the "falsehood in the claim must be *material* to the payment decision." *Id.* (emphasis added); *see also Universal Health Servs. v. United States ex rel. Escobar*, 579 U.S. 176, 181 (2016) ("A misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act.").

The Supreme Court has cautioned that the FCA is "not an all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Escobar*, 579 U.S. at 194. It has instructed that "[t]he materiality standard is demanding" and requires more than allegations of "minor or insubstantial" regulatory violations. *Id*. In applying *Escobar*, the Eighth Circuit has held that a relator must show that "the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." *Thayer v. Planned Parenthood of the Heartland, Inc.*, 11 F.4th 934, 938 (8th Cir. 2021). Factors relevant to the materiality analysis include (1) "the Government's decision to expressly identify a provision as a condition of payment"; (2) whether "the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement" or pays the claim "despite its actual knowledge that certain requirements were violated"; and (3) whether the "noncompliance is minor or insubstantial" or goes to the "'very essence of the bargain.'" *Escobar*, 579 U.S. at 193 n.5, 194–95.

Applying the analysis to this case, the Court holds Counts I through VI do not plausibly allege that any false statements were material. First, these Counts do not allege that the Government has made compliance with Medicare marketing regulations an *express* condition of payment. These counts merely allege that the Insurance Carriers certified that they would adhere to Medicare marketing and marketing-oversight regulations and guidelines, but then failed to

12

ensure MMA's compliance with those regulations. The Complaint cites no regulation indicating that an independent broker's compliance with Medicare marketing guidelines was material to CMS's decision to pay the Insurance Carriers. And the recent caselaw applying *Escobar* indicates that the generic statement that the Insurance Carriers sign stating that they "agree[] to adhere to all marketing requirements," SAC ¶ 276, is not enough to show that compliance with marketing guidelines is an express condition of payment. *Haw. ex rel. Torricer v. Liberty Dialysis-Haw. LLC*, 512 F. Supp. 3d 1096, 1122 (D. Haw. 2021) ("[F]or purposes of any false certification theory . . . ample case law reasons that such general statements of compliance with all laws are insufficient to state a viable FCA cause of action.") (cataloging cases)). This weighs in favor of finding no materiality.

Second, the Complaint does not identify an instance of CMS recouping payments from an insurance carrier based on marketing violations. On the contrary, the Complaint acknowledges the availability of a range of intermediate CMS sanctions for enforcing marketing regulations and guidance. *See* SAC ¶ 271 ("If CMS 'finds that plan sponsors failed to comply with the applicable rules and guidance, CMS may take compliance and/or enforcement actions, including, but not limited to intermediate sanctions and/or civil money penalties."). The existence of these options suggests CMS would not seek to recoup payments or refuse to pay claims for marketing violations. *See* 42 C.F.R. § 422.750(a) (stating the sanctions that "may be imposed" include suspension of an organization's ability to enroll Medicare beneficiaries, suspension of payment for beneficiaries enrolled after the date CMS notifies the organization of the sanction, and suspension of communication activities to Medicare beneficiaries). The Supreme Court has instructed that "materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar*, 579 U.S. at 193. Since it appears CMS would never seek to recoup

13

payments or refuse to pay claims in response to marketing violations, this also weighs in favor of finding the falsehood was not material.

This conclusion makes sense because when there is such a sophisticated administrative mechanism in place for managing and correcting Medicare marketing violations which does not seek to recoup payments for marketing violations, "it would be curious to read the FCA, a statute intended to protect the government's fiscal interests, to undermine the government's own regulatory procedures." *United States ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d 791, 796 (8th Cir. 2011) (holding prior to *Escobar* that the FCA does not address instances of regulatory noncompliance irrelevant to the government's disbursement decisions). Holding otherwise would "short-circuit" the remedial process the Government established to address non-compliance with those regulations. *United States ex rel. Wilkins v. United Health Grp.*, 659 F.3d 295, 310 (3d Cir. 2011) *abrogation recognized by United States ex rel. Freedom Unlimited Inc. v. City of Pittsburgh*, 728 F. App'x 101, 106 (3rd Cir. 2018) (noting *Escobar* eliminated the dispositive distinction, for purposes of FCA materiality, between condition of payment and condition of participation). It would also "unwisely shift the burden of enforcing the Medicare regulations to [the courts,] even though the administration of the vast and complicated Medicare program is best left to the administrators" who are "unquestionably better suited than federal courts to ensure compliance with the Medicare marketing regulations." *Id*. at 311.

Third, Counts I through VI do not allege that the violations at issue go to the "essence" of the Medicare bargain. The violations here—improperly certifying certain insurance agents as qualified to sell certain products, using impermissible sales tactics, gaming the complaint tracking system to artificially bolster the MAOs Star Ratings, and even enrolling beneficiaries in the Extra Help program without checking whether they met income limitations—do not go to the essence of the bargain because none of the alleged violations led to the enrollment of someone who was

14

ineligible for Medicare, misled an enrollee about the benefits of a particular plan, or led to someone who was eligible for Medicare not receiving benefits.[7]

Hence, the factors weigh against finding the false statements were material to the Government's payment decisions.

Relator's arguments to the contrary are unpersuasive. Tellingly, Relator's brief does not attempt to argue the *Escobar* factors in a systematic way, probably because these factors weigh against finding materiality. And the cases Relator cites in support are almost all district court cases decided prior to *Escobar*.

The Court concludes Counts I through VI fail to allege the requisite materiality to survive a motion to dismiss. Further, because it appears re-pleading could not cure the flawed premise on which these Counts are founded, dismissal of these Counts should be with prejudice.

### III. Counts I through VI also fail to allege materiality with particularity.

The conclusory allegations in Counts I and III through VI that CMS would have denied payment had it known of MMA's violations are insufficient under Rule 9(b)'s heightened pleading standards. Post-*Escobar* several courts have rejected as insufficient general statements that "but for" a defendant's fraud, the government would not have made a payment. *See, e.g.*, *United States ex rel. Watt v. VirtuOx, Inc.*, No. 19-cv-61084, 2021 WL 3883944, at *6 (S.D. Fla. Aug. 31, 2021) ("conclusory and unsubstantiated insistence" that defendant's compliance with a regulatory requirement was material to Medicare payment "is not enough"); *United States ex rel. Lampkin v. Pioneer Educ.*, No. 16-cv-1817, 2020 WL 4382275, at 4-5 (D.N.J. July 31, 2020) (conclusory

---

[7] This conclusion is bolstered by the absence of any allegation that CMS has rejected any Medicare Advantage plan sold by MMA even though: the alleged misconduct has been occurring since 2009 and spans many different states; Relator reported her concerns to the insurance departments in Missouri and Kansas more than four years ago, and they have not taken any action; her actions were made public some time ago, and the United States Department of Justice investigated and declined to intervene. If the violations went to the essence of the bargain, presumably some regulatory agency somewhere would have become involved.

15

Case 4:18-cv-00860-DGK   Document 101   Filed 08/22/22   Page 15 of 17

allegation that false statements "caused the Department of Education to pay claims under Title IV HEA Programs that it would not have paid but for Defendants' fraud" insufficient).

The Complaint make similar naked assertions of materiality. *See, e.g.*, SAC ¶ 88 ("MMA's violations of CMS regulations were material"); ¶ 134 ("[e]ach and every commission . . . paid to MMA . . . would not have been paid if CMS knew about MMA's violations of CMS regulations"); ¶ 219 ("CMS would never have authorized the payment of commissions or kickbacks funded by federal dollars to MMA knowing that MMA agents were not properly certified"). Such statements are insufficient under Rule 9(b). *See, e.g.*, *Lampkin*, 2020 WL 4382275, at *5 (noting the complaint lacked any allegations in support of its conclusory declaration of materiality). Hence, Counts I and III-VI do not allege materiality with the requisite particularity.

Similarly, the first theory pled in Count II—that Carefree Insurance violated the FCA by funding MMA's expansion despite knowing that MMA was engaged in the Agent Certification Scheme and the Marketing Scheme—fails because the Complaint does not make even a conclusory allegation that the Government would not have paid some premiums or commissions if it had known about the funding and bonuses Carefree Insurance allegedly provided to MMA. After carefully reviewing the Complaint, as well as Relator's response to Carefree Insurance's motion to dismiss, the Court cannot find any allegation of materiality to support the first theory of liability pled in Count II.

Since Relator has failed to allege materiality with particularity despite the fact that this case is almost four years-old and the operative complaint is Relator's third attempt at pleading her claims, the Court grants dismissal with prejudice because further attempts at amendment would be futile.

16

Case 4:18-cv-00860-DGK   Document 101   Filed 08/22/22   Page 16 of 17

**IV.     The Court does not address Defendants' remaining arguments for dismissal.**

The Court notes that Defendants have raised several other arguments that the Complaint is defective and should be dismissed.  For example, each Defendant argues the Complaint fails to allege sufficient representative examples of false claims, or that they knowingly submitted false claims.  While these arguments appear to have merit, because the above rulings are dispositive, the Court need address them.

## Conclusion

For the reasons stated above, the motions to dismiss (ECF Nos. 67, 69, 74, and 76) are GRANTED.  All claims against all Defendants are DISMISSED WITH PREJUDICE.

**IT IS SO ORDERED.**

Dated:  August 22, 2022                         /s/ Greg Kays
                                                GREG KAYS, JUDGE
                                                UNITED STATES DISTRICT COURT